**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICHARD G. CONVERTINO,

        Plaintiff,

v.                              Case No. 07-CV-13842

UNITED STATES DEPARTMENT OF JUSTICE,

        Defendant.

                                    /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL AND CLOSING CASE

Pending before the court is Plaintiff Richard Convertino's motion to compel production from non-party reporter David Ashenfelter and the Detroit Free Press ("Free Press") filed on July 6, 2007. A hearing on the motion was held before the court on June 2, 2008. Because the court concludes that the information sought is neither privileged nor beyond the scope of discovery set forth in Federal Rule of Civil Procedure 26, the court will grant the motion with respect to Ashenfelter. But because Convertino's subpoena of the Free Press should be limited under Rule 26's mandate against cumulative or duplicative discovery, the court will deny the motion as to the Free Press.

## I. BACKGROUND

Plaintiff Richard Convertino is a former assistant United States attorney ("AUSA") who worked in the Detroit United States Attorney's office. (Redacted OIG Report at 2, Ashenfelter's Ex. E.) As an AUSA, Convertino led the Government's prosecution of four terrorism suspects in the 2003 trial *United States v. Koubriti*. (*Id.*) In November 2003,

the Department of Justice Office of Professional Responsibility ("OPR") began an internal investigation of possible ethics violations by Convertino in connection with the trial. (*Id.* at 1.) Some of the details of this investigation were described in a January 17, 2004 article "Terror Case Prosecutor is Probed on Conduct" (the "Article"), printed in the Free Press under the byline of David Ashenfelter. (Article at 1, Ashenfelter's Ex. C.) Ashenfelter reported that "[U.S. Justice] Department officials, who spoke on condition of anonymity, fearing repercussions" divulged that the OPR was investigating Convertino for several alleged misdeeds related to the *Koubriti* prosecution.[1] (*Id.*) Convertino responded on February 13, 2004 by filing suit against the Department of Justice ("DOJ") in the United States District Court for the District of Columbia, claiming the Department had violated the federal Privacy Act, 5 U.S.C. § 552a, by publicizing confidential information about the OPR investigation. (*See* Complaint at 2, Pl.'s Ex. 3.)

During discovery, Convertino attempted to learn the identity of the Department of Justice officials responsible for revealing his confidential information to the Free Press by noticing the DOJ for deposition testimony and the production of relevant documents about the persons mentioned in the Article. (4/25/2007 Letter at 3, Pl.'s Ex. 2.) DOJ representatives responded by claiming that they could not name Ashenfelter's sources because the Department's Office of the Inspector General's ("OIG's") exhaustive investigation into the matter did not reveal the source. (*Id.*) The OIG investigation

---

[1]According to the Article, these allegations included: failing to get authorization before arranging plea bargains and sentence reductions, attempting to persuade a federal employee to provide confidential information for use against an adverse witness, arranging a deal with another criminal defendant without consulting the prosecutor handling the case, withholding from the defense potentially damaging credibility evidence on the prosecution's primary witness and threatening the defense attorney with a baseless criminal investigation if the attorney reported the misconduct to the judge. (Article at 1, Ashenfelter's Ex. C.)

focused on the approximately thirty DOJ employees[2] who had knowledge of, or access to, the only documents that contained all of the information reported in the Article. All of these individuals were interviewed by the OIG and provided affidavits stating that they had not revealed the information. (*Id.*) OIG also reviewed the relevant correspondence between the Detroit United States Attorney's Office ("USAO") and the OPR and all the documents associated with the OPR's allegations in its investigation. (*Id.* at 6.) Despite these efforts, OIG was "unable to determine by a preponderance of the evidence" the identity of Ashenfelter's sources. (*Id.* at 16.) After obtaining and reviewing OIG's report on the investigation, Convertino served subpoenas upon Ashenfelter and the Free Press, demanding that they disclose the identity of the anonymous DOJ officials cited in the Article. (Subpoena, Pl.'s Ex. 1.)

## II. STANDARD

The scope of discovery available to parties in a civil action is outlined in Federal Rule of Civil Procedure 26. As a general matter, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discovery privileges, like the evidentiary privileges used at trial, are determined by the Federal Rules of Evidence. Fed. R. Evid. 1101(c) ("The rule with respect to privileges applies at all stages of all actions, cases, and proceedings."). Rule 501 specifies:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court

---

[2]The OIG investigated individuals from the Detroit United States Attorney's Office as well as officials in Washington, D.C. from various DOJ departments, including the Office of the Attorney General, the Office of the Deputy Attorney General, the Office of Legislative Affairs, the Office of Legal Counsel, the Criminal Division, the Counter Terrorism Section of the DOJ, the Executive Office of United States Attorneys and the OPR.

> pursuant to statutory authority, the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

Fed. R. Evid. 501. However, federal courts are required to apply state privilege law "with respect to an element of a claim or defense as to which State law supplies the rule of decision." *Id.*

Even if a party's discovery request is non-privileged and relevant, it will not be granted if it constitutes discovery abuse. The court must limit discovery, either on motion or of its own accord, in a number of circumstances. Fed. R. Civ. P. 26(b)(2)(C). Discovery cannot be had if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). A court will likewise deny discovery if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C)(ii). Finally, discovery is not permitted when its "burden or expense . . . outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii).

Additionally, a party confronted with a potentially harmful discovery request may move the court for a protective order. Fed. R. Civ. P. 26(c)(1). The court may issue such an order, for good cause, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.*

## III.  DISCUSSION

In his response to Convertino's motion to compel, Ashenfelter asserts that the identity of his sources is shielded by a qualified reporter's privilege. Such a privilege

has been applied in civil actions by some federal circuit courts, which have concluded

that the First Amendment's protection of news-gathering activities mandates the

extension, under certain circumstances, of a conditional privilege over the identity of

reporters' confidential sources. *E.g.*, *Zerilli v. Smith*, 656 F.2d 705, 710-12 (D.C. Cir.

1981). However, the Sixth Circuit has explicitly declined to recognize a qualified First

Amendment privilege for reporters. *Grand Jury Proceedings*, 810 F.2d 580, 584-86 (6th

Cir. 1987). For this reason, Convertino's motion to compel may be blocked only if it

constitutes discovery abuse under Federal Rule of Civil Procedure 26.

## A. The Reporter's Privilege

The foundation of the modern reporter's privilege[3] rests on the Supreme Court's

decision in *Branzburg v. Hayes*, 408 U.S. 665 (1972). In *Branzburg*, the Court held that

the First Amendment does not relieve a reporter from the obligation to appear before a

grand jury and respond to relevant questions, even if this requires the reporter to

divulge confidential information. *Id.* at 690-91. In the five-Justice majority opinion

authored by Justice White, the Court declined to recognize a First Amendment

testimonial privilege for reporters:

---

[3]As early as colonial times, various arguments for a "newsman's" privilege were advanced in American courts. 23 Charles Alan Wright, Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5426 (2008). In 1958 the Second Circuit became the first court to accept, in dicta, that such a privilege may be warranted under the First Amendment. *See Garland v. Torre*, 259 F.2d 545, 548 (2d Cir. 1958) ("[W]e accept at the outset the hypothesis that compulsory disclosure of a journalist's confidential sources of information may entail an abridgement of press freedom by imposing some limitation upon the availability of news."). To the extent that a reporter's privilege exists today, it is based on constitutional considerations. *E.g.*, *United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983) ("[A qualified reporters' privilege] has been imposed by the courts 'to reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principle concern of the First Amendment." (quoting *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972))).

5

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.

*Id.* at 689-90.

Yet despite its disavowal of a general reporter's privilege, the Court made several statements that suggested the First Amendment may extend to reporters a more limited protection from compelled disclosure. The *Branzburg* Court restricted its consideration to the "sole issue" of "the obligation of reporters to respond to grand jury subpoenas." *Id.* at 682. The Court's reasoning depended heavily on the history and importance of grand jury proceedings within our constitutional structure, *see id.* at 686-88, which make "the longstanding principle that 'the public . . . has a right to every man's evidence' . . . particularly applicable." *Id.* at 688 (alteration in original) (citations omitted) (quoting 8 John Wigmore, *A Treatise on the Anglo-American System of Evidence* § 2192 (J. McNaughton rev. ed. 1961)). And the *Branzburg* majority indicated that "news gathering is not without its First Amendment protections." *Id.* at 707. Further, a concurring opinion by Justice Powell – whose vote was decisive in the outcome of the case – stressed the "limited nature of the Court's holding." *Id.* at 709 (Powell, J., concurring). He asserted that reporters can be protected from harmful disclosures by a protective order or motion to quash, which should be decided on a case-by-case basis by balancing "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710 (Powell, J., concurring).

In the wake of *Branzburg*, federal appellate courts have grappled with the extent to which reporters enjoy a First Amendment testimonial privilege. Specifically, courts are divided on to what extent *Branzburg*'s holding, made in the context of a grand jury

proceeding, applies to civil cases. The majority of circuit courts have established a conditional privilege for reporters from whom civil litigants request discovery.[4] In so holding, these courts have taken a variety of approaches when considering *Branzburg*. *See Bruno*, 633 F.2d at 594 (treating Justice Powell's concurrence as the controlling opinion because his vote was needed to make the majority); *Riley*, 612 F.2d at 714-15 (relying heavily on those parts of *Branzburg* acknowledging the First Amendment's protection of news gathering); *Farr*, 522 F.2d at 467 (considering Justice White's opinion a plurality and not a majority); *Silkwood*, 563 F.2d at 437 (reading *Branzburg* to itself establish a qualified First Amendment privilege)*; Zerilli*, 656 F.2d at 711-12 (distinguishing *Branzburg* as applicable only to criminal cases). The contours of the reporters' privilege vary somewhat between those jurisdictions that recognize it, but all treat it as a qualified privilege that may be dispelled by a balancing test.[5]

---

[4]To date, the First, Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth and District of Columbia Circuits have established some form of the qualified reporters' privilege in civil proceedings. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 595-97 (1st Cir. 1980); *Baker*, 470 F.2d at 784-85; *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979); *LaRouch v. National Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir. 1986); *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 725 (5th Cir. 1980); *Cervantes v. Time, Inc.*, 464 F.2d 986, 992-93, 992 n.9 (8th Cir. 1972); *Farr v. Pitchess*, 522 F.2d 464, 467 (9th Cir. 1975); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 436-37 (10th Cir. 1977); *Zerilli*, 656 F.2d at 712. The Eleventh Circuit likewise recognizes a reporters' privilege, having inherited the Fifth Circuit's holding in *Miller*. *See United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986).

[5]*Compare Burke*, 700 F.2d at 76-77 ("[D]isclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.") *with Zerilli*, 656 F.2d at 713-14 (listing the "guidelines" of applying the reporters' privilege as whether the information "goes to the heart" of a civil litigant's case, the extent of the litigant's efforts to obtain the information from other sources, and the nature of the litigation at hand, in particular whether the reporter from whom discovery is sought is a party to the action).

The Sixth Circuit addressed the reporters' privilege in *Grand Jury*, when it considered whether to grant a writ of habeas corpus to a reporter detained by a state court for refusing to comply with a county grand jury subpoena. 810 F.2d at 581. Relying on the opinions of the other circuit courts, which had already accepted a qualified reporters' privilege, the petitioner claimed that a "reading of Justice Powell's concurring opinion is superimposed upon Justice White's majority decision" and entitled him to a First Amendment privilege suspended only upon "'a clear and convincing showing of relevancy, essentiality, and exhaustion of non-media sources' for obtaining information." *Id.* at 583-84.

The Sixth Circuit's interpretation of *Branzburg*, however, led it to reject the petitioner's arguments. Noting that "acceptance of the position urged upon us by the [petitioner] would be tantamount to our substituting, as the holding of *Branzburg*, the dissent written by Justice Stewart . . . for the majority opinion," *id.* at 584, the *Grand Jury* court pointed out that the *Branzburg* majority had considered and rejected "a testimonial privilege conditioned upon the inability of prosecutors to establish relevancy, unavailability from other sources, and a need so compelling as to override invasion of first amendment interests occasioned by disclosure," *id.* (citing *Branzburg*, 408 U.S. at 680). Recognizing the *Branzburg* majority's reference to Professor John Henry Wigmore's warning against "obstructing the search for truth by the creation of additional testimonial privileges," *id.* (citing *Branzburg*, 408 U.S. at 690 n.29), the Sixth Circuit determined that "[i]t is apparent, from the extensive discussion in the majority opinion of policy reasons urged upon it as supporting adoption of a reporter's testimonial privilege, that, in the judgment of the majority, the last three of Professor Wigmore's predicates [to

8

recognizing any privilege against disclosure] are lacking," *id.*[6]   *Grand Jury* also limited

the broadly-sweeping language in Justice Powell's concurrence.  The Sixth Circuit

considered his endorsement of a case-specific balancing test merely an elaboration of

the majority's admonition that the First Amendment protects reporters from bad faith

grand jury investigations.  *Id.* at 585-86.  The Sixth Circuit explicitly "decline[d] to join

some other circuit courts, to the extent that they have . . . adopted the qualified privilege

balancing process urged by the three *Branzburg* dissenters and rejected by the

majority."  *Id.* at 584.[7]

The Sixth Circuit, then, has adopted a view opposite from most other circuit

courts by declining to recognize *any* reporters' privilege, qualified or absolute, in civil

cases.  This understanding of *Grand Jury* is made clear by two of the three district

courts in the Sixth Circuit that have considered claims of a reporters' privilege after the

Court of Appeals issued its opinion.  Indeed, it is the position taken by two opinions of

---

[6]Wigmore's predicates are:

(1) the communications must originate in a confidence that they will not be disclosed; (2) confidentiality must be essential to the maintenance of the relationship between the parties; (3) the relationship must be one which, in the opinion of the community, ought to be fostered; and (4) the injury that would inure to the relationship by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of the litigation.

*Grand Jury*, 810 F.2d at 584 (citing 8 J. Wigmore, *A Treatise on the Anglo-American System of Evidence* § 2286 (J. McNaughton rev. ed. 1940)).

[7]As examples of those Circuit Courts it "decline[d] to join," the Sixth Circuit listed the following cases: *Zerilli*, 656 F.2d 705, *Burke*, 700 F.2d 70, *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980), *LaRouch*, 780 F.2d 1134 and *Miller*, 621 F.2d 721.  *Grand Jury*, 810 F.2d at 584 n.6.  It is important to note that, although *Grand Jury Proceedings* dealt with subpoenas issued for a criminal prosecution, *Zerilli*, *LaRouch* and *Miller* confront this issue in a civil setting.

9

judicial officers of this district.[8]  In an instructive case from the Eastern District of

Michigan, *In re Daimler Chrysler AG Securities Litigation*, 216 F.R.D. 395 (E.D. Mich.

2003) (Whalen, MJ),[9] the court carefully analyzed *Branzburg*, *Grand Jury* and key cases

from other circuit courts, and deduced "the Court in *Grand Jury Proceedings* split with

other jurisdictions which recognize a qualified privilege and employ a constitutional

balancing test."  216 F.R.D. at 400.  The same magistrate judge reasserted this

conclusion in December of 2007, when he again considered a motion to compel a

reporter to disclose his confidential source.  *See Omokehinde v. Detroit Board of Ed.*,

No. 06-15241, 2007 WL 4357794, at *2 (E.D. Mich. Dec. 13, 2007)[10] ("*In re Grand Jury

Proceedings* proscribed the application of any First Amendment privilege, qualified or

otherwise, for reporters.").  The Northern District of Ohio has also endorsed this

---

[8]Ashenfelter cites three other opinions from the Eastern District of Michigan, claiming that they illustrate the availability of a reporters' privilege in this circuit: *United States v. Webber*, No. 02-80813 (slip op.) (E.D. Mich. July 14, 2003) (order granting motion to authorize subpoena and denying motion for protective order), *Clark v. Esser*, No. 92-72341, 1993 WL 13551485 (E.D. Mich. July 12, 1993) (order granting motion to quash subpoena), and *McArdle v. Hunter*, No. 81-10038 (slip op.) (E.D. Mich. Nov. 5, 1981) (order granting motion to quash subpoena).  These decisions have no precedential authority, being both unpublished and issued by a peer court; they are also unpersuasive on their merits.  *McArdle* was decided before *Grand Jury*, so it is inapplicable.  *Clark* is simply an order granting a motion to quash without analysis of the pertinent law or explanation of the court's reasoning.  *Webber*, though it does contain a limited examination of pertinent case law, relies on cases repudiated by the Sixth Circuit in *Grand Jury* and adopts the view of other circuits that a qualified reporters' privilege exists.  *Webber* relies on *Southwell v. Southern Poverty Law Ctr.*, 949 F. Supp. 1303 (W.D. Mich. 1996) for its reading of *Grand Jury*, an interpretation with which this court does not agree, see *infra.*

[9] The district court agreed with the analysis and incorporated the magistrate judge's proposed resolution in its entirety.

[10] The motion to compel had been referred to the magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A).

interpretation.  *Hade v. City of Fremont*, 233 F. Supp. 2d 884, 887-88 (N.D. Ohio 2002) (denying motion to quash subpoena).

Despite the language of *Grand Jury* and its interpretation by most district courts in this circuit, Ashenfelter asserts that this court is still free to find a reporters' privilege and extend it to him in these circumstances.  Citing the only post-*Grand Jury* decision from a district court within the Sixth Circuit sustaining a claim of reporters' privilege, *Southwell v. Southern Poverty Law Center*, 949 F. Supp. 1303 (W.D. Mich. 1996)(McKeague, J.), Ashenfelter argues that *Grand Jury* does not apply in the civil context:

> Although the Sixth Circuit, in dictum in *In re Grand Jury*, rejected the view held by most circuits that *Branzburg* could be interpreted as creating a qualified privilege, the court did so in the grand jury context and has yet to consider the much different issues raised in a civil proceeding.

*Southwell*, 949 F. Supp. at 1311-12.  After drawing this conclusion, *Southwell* sided with the majority of circuit courts and granted the media Defendants a qualified First Amendment privilege.  *Id.* at 1312.  Ashenfelter urges this court to do the same, emphasizing the damaging effect of forced disclosure on First Amendment interests as recognized in cases such as *Zerilli*.

However, this court cannot agree to characterize as *Grand Jury* dicta what is more clearly seen as the Sixth Circuit's conclusion: reporters are not entitled to a First Amendment privilege.  A judicial statement is considered *obiter dictum*, and thus non-binding, when it is "made while delivering a judicial opinion, but . . . is unnecessary to the decision of the case."  *Black's Law Dictionary* (8th ed. 2004).  The Sixth Circuit's

disavowal of a reporters' privilege is central to the holding of *Grand Jury*. As explained by Magistrate Judge Whalen in *Daimler Chrysler*:

> In reaching its decision in *Grand Jury Proceedings*, the Sixth Circuit undertook a detailed analysis of *Branzburg*, and concluded that the very test proposed by Respondents in the present case – that reporters have a qualified First Amendment privilege which can be overcome only if the party seeking the information meets some balancing test – was without support in either Justice White's majority opinion or Justice Powell's concurrence. Rather, the Sixth Circuit found that the only support for the qualified privilege/balancing approach was in Justice Stewart's dissent, which was "rejected by the majority." Furthermore, in reaching its conclusions, the Court in *Grand Jury Proceedings* explicitly rejected the reasoning and the holding of the very cases from other Circuits on which the Respondents rely in the present case, including *Zerilli v. Smith* . . . . The Sixth Circuit's analysis was not a mere passing comment, but central to its ultimate decision. Its statement that *Branzburg* did not create any qualified privilege was categorical, not ruminative.

*Daimler Chrysler*, 216 F.R.D. at 401 (citations omitted) (quoting *Grand Jury*, 810 F.2d at 584).

Simply put, this court is bound by the Sixth Circuit's determination: *Branzburg* forecloses recognition of a qualified First Amendment privilege for reporters. "The Sixth Circuit's decision in *Grand Jury*, though a minority of one, is the law in this circuit." *Hade*, 233 F. Supp. 2d at 888.

Ashenfelter's additional arguments to the contrary do not persuade the court to depart from this conclusion. Ashenfelter claims that the Sixth Circuit's decision in *NLRB v. Midland Daily News*, 151 F.3d 472 (6th Cir. 1998), recognizes constitutional protection for anonymous speech and thus undercuts *Grand Jury*'s general denial of a First Amendment reporters' privilege. Closer examination, however, reveals that this case is inapplicable. In *Midland*, the Sixth Circuit considered whether to enforce the National Labor Relations Board's ("NLRB's") subpoena calling for the *Midland Daily*

*News* to identify an anonymous advertiser. *Id*. at 472. The court deemed the NLRB's exercise of its subpoena power a form of regulation, making the issue in *Midland* whether this regulation was an unwarranted governmental intrusion on the First Amendment right to commercial speech. *Id*. at 474-75. The extent to which the Government may directly control commercial speech has nothing to do with the extent to which a media defendant's First Amendment interests can be incidentally burdened by a private litigant's need for discovery.

Ashenfelter's assertions that Michigan's reporters' shield law[11] is ground for denying Convertino's motion is similarly unavailing. Since Convertino has only federal claims, evidentiary privileges are determined solely by federal law. *See* Fed. R. Evid. 501. The court agrees that Michigan's public policy of providing reporters protection from disclosure should not be ignored, but this factor – like the potential danger to reporters' First Amendment interests – can be given adequate weight in Rule 26 analysis. Harm resulting from Ashenfelter's reliance on the protection of Michigan's shield law is part of the "burden" imposed by Convertino's discovery request. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

---

[11]Michigan law extends the following privilege to reporters:

A reporter or other person who is involved in the gathering or preparation of news for broadcast or publication shall not be required to disclose the identity of an informant, any unpublished information obtained from an informant, or any unpublished matter or documentation, in whatever manner recorded, relating to a communication with an informant, in any inquiry authorized by this act, except an inquiry for a crime punishable by imprisonment for life when it has been established that the information which is sought is essential to the purpose of the proceeding and that other available sources of the information have been exhausted.

MCL §767.5a(1).

Ashenfelter's final argument calls upon this court to recognize a reporters' privilege as feature of federal common law and not as a constitutional principle. He claims that the recognition of a qualified reporters' privilege by ten of twelve federal judicial circuits and the legislatures of 48 states plus the District of Columbia[12] show that the privilege has become a common law rule post-*Branzburg*. However, the Sixth Circuit's disavowal of a First Amendment-based reporters' privilege in *Grand Jury* makes it equally clear that the Sixth Circuit does not consider a reporter's privilege in civil cases justified "in the light of reason and experience." Fed. R. Evid. 501.[13] This court declines to circumvent the Sixth Circuit's ruling against a reporters' privilege by making artificial distinctions between one grounded in the First Amendment and one based in common law. The identity of Ashenfelter's DOJ sources does not fall under any evidentiary privilege recognized in the Sixth Circuit and is therefore discoverable should Convertino's request satisfy the requirements of Federal Rule of Civil Procedure 26.

## B. Rule 26 Inquiry

The mere fact that the identity of Ashenfelter's source does not fall under an evidentiary privilege does not mean Ashenfelter receives no First Amendment

---

[12]Forty-eight states and the District of Columbia have put in place a reporters' privilege, either by the passage of a press shield law or judicial recognition. A detailed description of which states have accepted a reporters' privilege and the means by which they did so is offered in *New York Times Co. v. Gonzalez*, 382 F. Supp. 2d 457, 502-04 (S.D.N.Y. 2005).

[13] Particularly telling is the Sixth Circuit's conclusion that a reporters' privilege met only one of Wigmore's four fundamental pre-conditions to the recognition of any testimonial privilege. *Grand Jury*, 810 F.2d at 584.

protection. The Sixth Circuit in *Grand Jury* reiterated the need for courts to "follow the admonition of the majority in *Branzburg* to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony," although it cautioned that "this balancing of interests should not then be elevated on the basis of semantical confusion[] to the status of a first amendment constitutional privilege." *Grand Jury*, 810 F.2d at 586.[14] Established procedures for limiting the scope of discovery – a task long committed to the discretion of the trial court, *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993), – provide the district judge with "ample powers . . . to prevent abuse." *Herbert v. Lando*, 441 U.S. 153, 177 (1979) (discussing Fed. R. Civ. P. 26(b)(1), 26(c)).

### 1. Scope of Discovery

The identity of Ashenfelter's sources is within the scope of discovery because it is "nonprivileged matter" and "relevant to [a] party's claim or defense." Fed. R. Civ. P. 26(b)(1). As the DOJ points out in its brief, Convertino cannot sustain his burden of

---

[14]The First Circuit has commented that:

> Whether or not the process of taking First Amendment concerns into consideration can be said to represent recognition by the Court of a "conditional," or "limited" privilege is, we think, largely a question of semantics. The important point for purposes of the present appeal is that courts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights.

*Bruno & Stillman*, 633 F.2d at 595. Magistrate Judge Whalen asserted that recognizing a reporters' privilege makes crucial differences to the distribution of the burden of proof, *see In re Daimler Chrysler AG Securities Litigation*, 216 F.R.D. 395, 402 n.9 (E.D. Mich. 2003). The First Circuit's reasoning shows, though, that doing so is not the only way of vindicating a reporters' First Amendment interests.

proof on the Privacy Act claim without identifying Ashenfelter's source. To prove his

Privacy Act case, Convertino must demonstrate that the agency acted "in violation of

the Act in a willful or intentional manner, either by committing the act without grounds for

believing it to be lawful, or by flagrantly disregarding others' rights under the Act."

*Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). To establish that the DOJ

committed a willful or intentional violation, he must present evidence of the disclosing

person's state of mind, which requires him to identify and question those who

perpetrated the allegedly improper disclosure. *Hatfil v. Gonzales*, No. 03-1793 at 15-16

(slip op.) (D.D.C. Aug. 13, 2007) (memorandum opinion granting motion to compel and

granting motions to quash subpoenas). As Convertino's claim depends on his ability to

question Ashenfelter's sources, their identifies are undoubtedly relevant under Rule

26(b)(1).[15]

## 2. Limitations on Discovery

### a. Ashenfelter

Convertino's subpoena of Ashenfelter does not amount to discovery abuse.

First, Convertino's request is not "unreasonably cumulative or duplicative" or obtainable

"from some other source that is more convenient, less burdensome, or less expensive."

Fed. R. Civ. P. 26(b)(2)(C)(i). Convertino is not asking for information that he knows,

has already received through discovery from Ashenfelter or another source, or can

ascertain from other intelligence he has accumulated during discovery. He attempted to

---

[15]Because of Convertino's burden of proof, his request would meet even the stricter standard imposed by the qualified privilege analysis laid out in *Southwell* and urged by Ashenfelter, which requires "the requested information goes to the heart of the litigant's case." 949 F. Supp. at 1312.

identify Ashenfelter's sources by deposing the DOJ, but instead learned that an extensive internal investigation, conducted by the Department's OIG, was only able to narrow the pool of potential "leaks" to approximately 30 employees. (4/25/2007 Letter at 3-4, Pl.'s Ex. 2.) It certainly will be less convenient, more burdensome, and more expensive for Convertino to depose each of these officials individually. Doing so is likely to be futile, as the OIG has already obtained an affidavit from each denying that he provided information to the Free Press. (Redacted OIG Report at 5, Ashenfelter's Ex. E.) It is unrealistic to expect Convertino to have better results, given his inferior resources and the threat of perjury sanctions looming over any individual that may have already provided false information to OIG inspectors in an affidavit. Under these circumstances, turning to Ashenfelter – the one party absolutely known to have the information Convertino needs – is hardly an abuse of discovery.

Second, Convertino has not "had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(C)(ii). As detailed above, Convertino has tried to use other means of discovery to unmask Ashenfelter's sources. He did not go directly to Ashenfelter until it became reasonably clear that doing so would probably be the only way for him to learn which official or officials supplied the reporter with the relevant information.

Third, "the burden or expense of the proposed discovery" does not "outweigh[] its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(C)(iii). The potential benefit of the information is great. Convertino's case has a pressing need for

the identity of Ashenfelter's sources, and discovery from Ashenfelter seems, at this point, the only way to get it. At stake is a case brought under the Privacy Act, a statute meant to "prevent the kind of illegal, unwise, overbroad, investigation and record surveillance of law-abiding citizens," and "promote observance of valued principles of fairness and individual privacy." S. Rep. No. 93-1183, at 1 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6916, 6916.

The burden to Ashenfelter of Convertino's request does not outweigh these factors. The discovery requested of Ashenfelter – his presence at a deposition and the presentation of documents already within his control – will by no means cripple his resources, and in any case his burden is small when compared to the money damages Convertino could potentially recover in this action.

The biggest factor counseling against disclosure is harm to Ashenfelter's First Amendment interests. Virtually every case in which a court compels a reporter to disclose a confidential source implicates at least some risk, direct or otherwise, that news gathering activities protected by the First Amendment may be hindered. As described by the Second Circuit:

> Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis . . . . The deterrent effect such disclosure is likely to have upon future "undercover" investigative reporting . . . threatens freedom of the press and the public's need to be informed.

*Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972). However, this generalized danger is minimized in this case, as the anonymous DOJ officials may well have violated federal law by communicating with Ashenfelter as to these matters. If the informants indeed violated the Privacy Act as Convertino alleges, potential sources of

further similar violations *should* be deterred from interactions of this kind with representatives of the press. This is not an instance where the reporter's informant reveals hitherto unknown dangerous or illegal activities that, being unlikely otherwise to come to light, result in reporting that is obviously more weighty in a court's calculation of First Amendment safeguards. Rather, this situation is more akin to a reporter's observation of criminal conduct, from which the Supreme Court has explicitly stripped constitutional protection: "we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it." *Branzburg*, 408 U.S. at 692.

For similar reasons, any reliance Ashenfelter placed on the Michigan reporters' privilege is misplaced. A reporter should not be allowed to use a state law to shield himself from disclosing his sources when the communication sought to be protected is a violation of federal law. Such reliance should not be encouraged by the court. Thus, the burden on Ashenfelter's First Amendment interests is minimal and the damage to his reliance on the Michigan shield law inconsequential. Both concerns are

overbalanced by Convertino's countervailing interests[16]  None of the provisions in Rule 26(b)(2)(C) call for this court to impose a discovery limitation.

Just as there is no evidence that Convertino is abusing discovery, there is no indication that Ashenfelter is entitled to a protective order under Rule 26(c).  Ashenfelter has not petitioned the court for such an order, as called for by Rule 26(c)(1).  More importantly, the proposed discovery will not subject Ashenfelter to "annoyance, embarrassment, oppression, or undue burden or expense."  *Id.*  Aside from the First Amendment considerations dealt with above, there is no evidence that fulfilling Convertino's request will cause Ashenfelter any hardship, beyond the ordinary inconvenience shouldered by anyone required to provide discovery.  Because the discovery sought from Ashenfelter is not subject to limitation under Rule 26(b)(2)(C) and does not justify a protective order, Convertino's motion to compel will be granted in regard to Ashenfelter.

---

[16]This case-specific balancing of interests is likely to yield the same results under the third factor in the *Southwell* privilege analysis, which requires "a case-by-case balancing of constitutional and societal interests . . . to determine whether First Amendment interests would be jeopardized by ordering disclosure."  949 F. Supp. at 1312.  Ashenfelter argues that a qualified privilege analysis must also include some evaluation of Convertino's case on the merits, claiming that disclosure is not appropriate if Plaintiff's claim cannot meet the standard for summary judgment.  *See Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1169 (Cal. Ct. App. 2005).  However, the authority cited for this position is drawn almost exclusively from defamation cases, which by their nature import heightened constitutional protection for defendants. There is no known authority for this court, having jurisdiction over the underlying suit, to deny a motion to compel based upon a proposed cart-before-horse determination that the merits of the claim are weak or lacking.

**b. The Free Press**

Based upon the court's approval of Convertino's request to Ashenfelter, and contingent upon its fulfillment, the court finds that the subpoena relating to the Free Press itself is outside the limitations of Rule 26(b)(2)(C). Specifically, the discovery sought from the Free Press is fairly determined to be "unreasonably cumulative [and] duplicative" because the information can be obtained from Ashenfelter, a "source that is more convenient, less burdensome, [and] less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Because the Free Press is a corporation, Rule 30(b)(6) requires it to respond to Convertino's subpoena by presenting for deposition "one or more officers, directors, or managing agents, or . . . other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). An organization's designated representative must be the individual with knowledge of the subject matter over which discovery is being had. When a party notices a newspaper for disclosure of confidential informants mentioned in one of its articles, its logical representative is the reporter who wrote the piece. If a party, in straights such as these, were to seek disclosures concerning an article printed without identification of its author, it may well be appropriate to demand the information from the newspaper itself. Here, however, compelling enforcement of Convertino's subpoenas would essentially require Ashenfelter be deposed as an individual *and* that the Free Press present him to be deposed as a representative of their organization, since he is the employee best qualified to testify about any communication with DOJ officials' regarding the Article. Such an order would result in superfluous, unproductive discovery and is not necessary for Convertino to receive the information he needs.

Besides the futility of deposing both Ashenfelter and a Free Press representative, whether that be Ashenfelter or someone else, the First Amendment interests at stake in this matter counsel against compelling discovery from the Free Press. As discussed with respect to Ashenfelter's subpoena, First Amendment interests are not a complete bar to disclosure. Nevertheless, the potential adverse effects on news gathering activities, posed by any order compelling disclosure of a confidential source, suggests that an order to disclose should be as narrow as possible. Given that Convertino's best chance of learning the identity of Ashenfelter's sources is deposing Ashenfelter himself, and that an additional subpoena of the Free Press is unlikely to produce more information than that uncovered in a deposition of Ashenfelter, the motion to compel is denied, without prejudice[17] as to the Free Press.

## IV. CONCLUSION

IT IS ORDERED that Plaintiff's July 6, 2007 Motion to Compel Production from Non-Party Reporter David Ashenfelter and Non-Party Corporation Detroit Free Press [Dkt. #1] is GRANTED IN PART AND DENIED IN PART. Specifically, it is GRANTED with respect to David Ashenfelter and DENIED with respect to the Detroit Free Press.

IT IS FURTHER ORDERED that the clerk of the court is DIRECTED to close this case insofar as all matters in controversy has been resolved.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

---

[17] Contingent upon, for example, evidence of non-compliance with this order through impossibility, it may be appropriate to revisit the court's analysis as to the discovery obligations of the Free Press.

Dated:  August 28, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 28, 2008, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522