# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RICHARD CONVERTINO,

      Plaintiff,

                              Case No. 07-CV-13842-DT

v.

                              Hon. Robert H. Cleland

UNITED STATES DEPARTMENT OF JUSTICE,

      Defendant.

_____/

| | |
|---|---|
| Stephen M. Kohn | Herschel P. Fink (P13427) |
| Kohn, Kohn | Richard E. Zuckerman (P26521) |
| 3233 P Street NW | Brian D. Wassom (P60381) |
| Washington, DC 20007 | HONIGMAN MILLER SCHWARTZ AND COHN LLP |
| 202-342-6980 | 2290 First National Building |
| sk@kkc.com | Detroit, MI 48226 |
| | (313) 465-7400 |
| Attorneys for Plaintiff Convertino | hpf@honigman.com |
| | bdw@honigman.com |
| John R. Tyler | |
| Jonathan E. Zimmerman | Attorneys for Non-Party David Ashenfelter |
| Jeffrey M. Smith | |
| Scott Risner (P70762) | Robert Bernius |
| U.S. Dept. of Justice, Civil Division | Leslie Machado |
| 20 Massachusetts Ave, NW, Room 7116 | Nixon Peabody LLP |
| Washington DC 20001 | 401 9th Street, N.W., Suite 900 |
| (202) 353-0441 | Washington, D.C. 20004 |
| jonathan.zimmerman@usdoj.gov | (212) 585-8312 |
| | rbernius@nixonpeabody.com |
| Attorneys for the U.S. Dept. of Justice | |
| | Attorneys for Non-Party Detroit Free Press, Inc. |

_____/

## NON-PARTY DAVID ASHENFELTER'S OMNIBUS RESPONSE TO
## MOTION FOR ORDER TO SHOW CAUSE WHY HE SHOULD NOT BE HELD IN CIVIL CONTEMPT
### [D/E 38] AND MOTION FOR SANCTIONS [D/E 39]

## STATEMENT OF ISSUES PRESENTED

1.      Where the United States Department of Justice has actually prosecuted some, and publicly threatened to prosecute others, for doing things materially identical to what Ashenfelter is accused of doing, and where Convertino, a former federal prosecutor, has labeled Ashenfelter a criminal conspirator, has Convertino failed to meet his heavy burden of proving that there is no conceivable basis for Ashenfelter's assertion of the Fifth Amendment privilege against self-incrimination?

2.      Where Ashenfelter has litigated his claims in good faith, should this Court deny Convertino's various and sundry requests for sanctions against Ashenfelter?

## **CONTROLLING AUTHORITY**

*Hoffman v. United States*, 341 U.S. 479 (1951)

*In re Morganroth*, 718 F.2d 161 (6th Cir. 1983)

## <u>TABLE OF CONTENTS</u>

CONCISE STATEMENT OF ISSUES PRESENTED ................................................................. i

CONTROLLING AUTHORITY ....................................................................................... ii

TABLE OF CONTENTS .............................................................................................. iii

INDEX OF AUTHORITIES .......................................................................................... vi

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF RELEVANT FACTS ................................................................. 2

     A.     Convertino Has Consistently and Repeatedly Accused
          Ashenfelter of Committing, or Contributing to, Criminal Acts .................. 2

          1.     Convertino's Complaint Accuses Ashenfelter of
               Participating in Criminal Activity ............................................. 2

          2.     In These Proceedings, Convertino Has Expressly
               Alleged—and This Court Has Acknowledged—the
               Potential Criminality of the Actions He Alleges ........................... 3

          3.     In Public Statements, Convertino Has Directly
               Accused Ashenfelter of Criminal Acts ....................................... 4

     B.     Ashenfelter Asserts the Fifth Amendment at His Deposition ..................... 5

III.   ARGUMENT ..................................................................................................... 6

     A.     Standards for Reviewing an Invocation of the Fifth
          Amendment Privilege ............................................................................ 6

          1.     The Fifth Amendment Liberally Protects Witnesses
               From Being Forced to Provide Any Information That
               May Supply a Link in the Chain of Evidence Needed
               to Prove a Crime ..................................................................... 6

          2.     The Privilege May Only Be Asserted Question-by-
               Question ............................................................................... 7

          3.     The Court Must Sustain The Privilege Unless It Is
               "Perfectly Clear" That Ashenfelter's Answer "Cannot
               Possibly" Help to Incriminate Him ............................................ 7

B.   Convertino's Arguments Fall Far Short ..................................................................9

    1.   Ashenfelter Need Not Lay the Groundwork for the
        Privilege Before Asserting It ................................................................9

    2.   Ashenfelter Need Not Be Aware of an Actual
        Investigation Against Him ...................................................................11

    3.   The Mere Fact of Asserting the Privilege Does Not
        Create an Adverse Inference That Then Destroys
        the Privilege .........................................................................................11

C.   Ashenfelter's Assertion of the Fifth Amendment Privilege
    Was Amply Justified .............................................................................12

    1.   Ashenfelter Could Be Charged With Conspiracy or
        Other Indirect Liability for Any Crime Committed by
        a Government Official ...........................................................................13

    2.   Direct or Indirect Violation of the Privacy Act ....................................13

    3.   Perjury, False Statements, and Obstruction of
        Justice ..................................................................................................14

    4.   Related Federal Statues Concerning Possession
        and Disclosure of Documents .............................................................16

    5.   Theft and Receipt of Government Information or
        Records ................................................................................................17

    6.   The Espionage Act and Disclosure of Confidential
        Information ............................................................................................18

    7.   Criminal Contempt of Court Order .......................................................20

    8.   Receipt, Possession, or Concealing of Stolen
        Property, M.C.L. 750.535 .....................................................................20

D.   Even If This Court Finds That Ashenfelter's Asserted
    Privilege Is Invalid, Convertino's Requested Relief Is
    Unjustified .............................................................................................21

    1.   Contempt and Coercive Sanctions Are Premature ............................21

    2.   Convertino's Requested Contempt Sanctions Are
        Excessive in Any Event .......................................................................21

E.  Convertino's Various and Sundry Requests for Sanctions
    Are Unfounded .................................................................................. 23

    1.  Convertino Has Consistently Salted the Record
        With Uncivil and Unfounded Accusations in Order to
        Taint the Court's Perception of Ashenfelter ................................. 23

    2.  Neither Rule Cited by Convertino Applies Here ........................... 24

        a.  Convertino Did Not Follow Rule 11's
            Prerequisites ....................................................................... 24

        b.  Rule 37 Only Punishes Objectively
            Unreasonable Conduct ........................................................ 25

    3.  Ashenfelter Has Done Nothing Sanctionable ............................... 26

        a.  Opposition to the Motion to Compel .................................... 26

        b.  Motion for Protective Order and Remission
            (D/E 28) ............................................................................... 26

        c.  Motion for Reconsideration of the November
            7, 2008 Order (D/E 32) ....................................................... 29

        d.  Emergency Motion Regarding Video
            Deposition (D/E 34) ............................................................ 30

        e.  Deposition Scheduling in October 2008 .............................. 30

        f.  Assertion of the Fifth Amendment in
            December 2008 ................................................................... 31

IV.  CONCLUSION ...................................................................................... 31

## **TABLE OF AUTHORITIES**

**CASES**

*Anton v. Prospect Cafe Milano, Inc.,*
    233 F.R.D. 216 (D.D.C. 2006) .................................................................................. 10

*Bank One of Cleveland, N.A. v. Abbe,*
    916 F.2d 1067 (6th Cir. 1990) .................................................................................. 9

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976) .................................................................................................. 12

*deAntonio v. Solomon,*
    42 F.R.D. 320 (D. Mass. 1967) ................................................................................ 15

*Doe v. Glazner,*
    232 F.3d 1258 (9th Cir. 2000) .................................................................................. 8

*Fisher v. United States,*
    425 U.S. 391 (1976) .................................................................................................. 10

*Hatfill v. Mukasey,*
    No. 08-5049, 2008 U.S. App. LEXIS 5755 (Mar. 11, 2008) ................................. 21-22

*Hoffman v. United States,*
    341 U.S. 479 (1951) .......................................................................................... *Passim*

*In re Atterbury,*
    316 F.2d 106 (6th Cir. 1963) .................................................................................... 9

*In re Corrugated Container Antitrust Litig.,*
    662 F.2d 875 (D.C. Cir. 1981) .................................................................................. 10

*In re Folding Carton Antitrust Litigation,*
    609 F.2d 867 (7th Cir. 1979) .................................................................................... 8

*In re Kave,*
    760 F.2d 343 (1st Cir. 1985) .................................................................................... 10

*In re Master Key Litigation,*
    507 F.2d 292 (9th Cir. 1974) .................................................................................... 8

*In re Morganroth,*
    718 F.2d 161 (6th Cir. 1983) ............................................................................. 7-8, 12

*Kastigar v. United States,*
    406 U.S. 441 (1972) .................................................................................................. 6

*LeBlanc v. Spector,*
    378 F.Supp. 310 (D.C. Conn. 1974)............................................................... 15

*NCS Pearson, Inc. v. McGrath & Assocs,*
    2006 U.S. Dist. LEXIS 34849 (E.D. Mich. May 31, 2006)........................... 12

*New York Times v. U.S.,*
    403 U.S. 713 (1971)....................................................................................... 19

*Robinson v. Jones,*
    142 F.3d 905 (6th Cir. 1998) .......................................................................... 9

*U.S. v. Arnott,*
    704 F.2d 322 (6th Cir. 1983) .......................................................................... 7

*U.S. v. Blizzard,*
    812 F.Supp. 79 (E.D. Va. 1993), *aff'd,* 27 F.3d 100 (4th Cir. 1994)............ 17

*U.S. v. Franklin, et al.*
    No. 1:05CR225 (E.D. Va).............................................................................. 19

*U.S. v. Leisure,*
    844 F.2d 1347 (8th Cir. 1988), *rehearing denied, cert. denied,* 488 U.S. 932 ...... 15

*U.S. v. Morison,*
    844 F.2d 1057 (4th Cir. 1988) ...................................................................... 17

*United States v. Argomaniz,*
    925 F.2d 1349 (11th Cir.1991) .................................................................. 7, 10

*United States v. Cuthbertson,*
    630 F.2d 139 (3d Cir. 1980) *cert. denied,* 449 U.S. 1126 (1981) ..................... 22

*United States v. Cutler,*
    6 F.3d 67 (2d Cir. 1993) ................................................................................ 22

*United States v. Doe,*
    465 U.S. 605 (1984)....................................................................................... 10

*United States v. Grable,*
    98 F.3d 251 (6th Cir.1996), *cert. denied,* 519 U.S. 1059 (1997) ................... 6, 10

*United States v. Seavers,*
    472 F.2d 607 (6th Cir. 1973) ........................................................................ 20

## STATUTES

5 U.S.C. § 552a(i)(1) ................................................................................................. 14

5 U.S.C. § 552a(b) ................................................................................................. 2-3

18 U.S.C. § 2 ....................................................................................................... 13

18 U.S.C. § 3 ....................................................................................................... 13

18 U.S.C. § 4 ....................................................................................................... 13

18 U.S.C. § 371 ..................................................................................................... 13

18 U.S.C. § 402 ..................................................................................................... 20

18 U.S.C. § 641 ..................................................................................................... 17

18 U.S.C. §§ 793(b) ............................................................................................... 18

18 U.S.C. § 798 ..................................................................................................... 19

18 U.S.C. § 1001 ................................................................................................... 14

18 U.S.C § 1510 .................................................................................................... 15

18 U.S.C. § 1512 ................................................................................................... 15

18 U.S.C. §§ 1621 ................................................................................................. 14

18 U.S.C. § 1622 ................................................................................................... 14

18 U.S.C. § 1905 ................................................................................................... 16

18 U.S.C. § 1924 ................................................................................................... 16

18 U.S.C. § 2071(a) ............................................................................................... 16

18 U.S.C. § 3282 ................................................................................................... 17

M.C.L. § 750.535 .................................................................................................. 20

Privacy Act of 1974 ................................................................................................. 2

## OTHER AUTHORITIES

1 MCCORMICK ON EVIDENCE .............................................................................. 7, 9-10

FED. R. CIV. P. 11(c)(2) ................................................................................................ 24

Fed. R. Crim. Pro. 6 ..................................................................................................... 11

Fed. R. Evid. 501 .................................................................................................. 22, 26

Fifth Amendment ................................................................................................. *Passim*

First Amendment .................................................................................................. *Passim*

Local Rule 7.1 ............................................................................................................ 30-31

Rule 11 ......................................................................................................................... 24

Rule 37 .................................................................................................................... 24, 25

Rule 26 .................................................................................................................... 27-28

Rule 30 .................................................................................................................... 27, 31

UNITED STATES ATTORNEY CRIMINAL RESOURCE MANUAL § 1665 .................................... 16

Wright, Miller & Marcus, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2018, pp. 272-73 .............................. 6

**I.**      **INTRODUCTION**

In his pending motions, Plaintiff Richard Convertino repeatedly castigates David Ashenfelter's exercise of his Fifth Amendment privilege.  Yet his arguments do not come close to satisfying the imposingly high burden of proof that Convertino bears.  Well-established Sixth Circuit law requires that, so long as this Court—based on the facts of the case, the parties' arguments, or even its extra-judicial awareness—can *imagine* the *possibility* of Ashenfelter being prosecuted for any crime for which the requested information could provide a link in the chain of supporting evidence, the Court must uphold Ashenfelter's privilege claim.

And it is not seriously debatable that Ashenfelter has a legitimate basis to fear prosecution in connection with the confidential documents and information that Convertino alleges Ashenfelter obtained and published.  Indeed, Convertino himself—through his legal allegations and his extra-judicial fundraising solicitations—has provided more than enough basis for the Court to find the risk of prosecution at least plausible.  Convertino has repeatedly touted his own skill and experience as a former federal prosecutor, and at the same time has levied accusations of "criminality" and "corruption" against various government officials, and against Ashenfelter for conspiring with them.   His legal allegations provide several conceivable options for prosecution of such allegations.  Not only the Privacy Act, but several other federal statutes criminalize the improper receipt and distribution of confidential government documents and information.  If Convertino's allegations are true, then Ashenfelter could face prosecution as one who participated directly in criminal acts, or who aided, abetted, concealed, or conspired with those who did.

What is more, the three most recent Attorneys General of the United States have each said publicly that reporters who did exactly what Convertino accuses Ashenfelter of doing—publishing confidential, terrorism-related information—could face prosecution under the Espionage Act.  Indeed, the DOJ has *already* prosecuted two people for doing exactly that.  Ashenfelter's fears are not fanciful; they are

1

quite plausible.  For that reason alone, the Court must uphold his assertion of the Fifth Amendment privilege.

Convertino also repeats many of the same requests for sanctions contained in his previous briefs. As explained in greater detail below, those arguments fail for the same reasons Ashenfelter gave when he previously opposed them.  Therefore, both Convertino's contempt motion and his sanctions motion should be denied.

## II.    STATEMENT OF RELEVANT FACTS

**A.    Convertino Has Consistently and Repeatedly Accused Ashenfelter of Committing, or Contributing to, Criminal Acts**

### 1.    Convertino's Complaint Accuses Ashenfelter of Participating in Criminal Activity

On February 13, 2004, Convertino filed his Privacy Act lawsuit against the DOJ in the District of Columbia.  The complaint seeks damages for alleged leaks of information concerning the investigation into Convertino's conduct by DOJ's Office of Professional Responsibility ("OPR"), and concerning a confidential terrorism informant used by Convertino—information that Convertino alleges first became public in a January 2004 news article written by Ashenfelter.

The complaint alleges that "DOJ . . . intentionally and/or willfully disclosed and/or made available to others the contents of records maintained in one or more Privacy Act systems of records pertaining to Plaintiff . . . in violation of the Privacy Act of 1974, as amended, 5 U.S.C. § 552a(b)."[1]  Subsection (i)(1) of the same Act makes such activities punishable as a misdemeanor.  Moreover, throughout his complaint, Convertino repeatedly characterized the DOJ's alleged release of information to Ashenfelter as a willful violation of a district court's sealing order,[2] as retaliation for the exercise of constitutionally protected

---

[1] Ex. A (Complaint) at ¶  132.

[2] *Id.* at ¶ ¶ 80, 82.

speech,[3] and as generally "illegal"[4] and "unlawful"[5] under "the Privacy Act . . . *[and] other laws of the United States.*"[6]

Specifically, Convertino alleges that DOJ officials distributed to Ashenfelter confidential documents in violation of the Privacy Act, including "a complete and un-edited version of the OPR referral"[7] (*i.e.*, the letter from DOJ officials referring the allegations against Convertino to the OPR) and "a copy of the December 2, 2003 OPR letter [to Convertino]."[8]   According to the complaint, Ashenfelter's publication of this information "directly harmed the United States' 'War on Terrorism' . . . and placed the life of a confidential informant and his family in grave danger."[9]

### 2.    In These Proceedings, Convertino Has Expressly Alleged—and This Court Has Acknowledged—the Potential Criminality of the Actions He Alleges

In the July 6, 2006 motion to compel with which Convertino began these proceedings and in subsequent filings, Convertino repeated the allegation that Ashenfelter's source within the DOJ "has engaged in potentially criminal conduct"[10] by virtue of his alleged Privacy Act violation.  Convertino made this argument in an effort to circumvent the qualified First Amendment privilege that Ashenfelter claimed.  In granting Convertino's motion, this Court cited that argument approvingly, holding that "this situation is more akin to a reporter's observation of criminal conduct, from which the Supreme Court has explicitly stripped constitutional protection."[11]

---

[3] *Id.* at ¶ ¶ 80-82.

[4] *Id.* at ¶ ¶ 84, 112, 122.

[5] *Id.* at ¶ 118.

[6] *Id.* at ¶ 122 (emphasis added).

[7] *Id.* at ¶ 112.

[8] *Id.* at ¶ 113.

[9] *Id.* at ¶ 125.

[10] D/E 1 at 5; D/E 25 (Reply Brief) at 18.

[11] D/E 27 at 19.  Of course, Ashenfelter disputed the relevance of these allegations to the availability to Ashenfelter of a qualified First Amendment Reporter's Privilege, and would continue to do so on appeal. But that issue is not relevant in this context.

3.      **In Public Statements, Convertino Has Directly**
        <u>**Accused Ashenfelter of Criminal Acts**</u>

In case Convertino's pleadings and legal briefs left any ambiguity as to whether he considers Ashenfelter's actions criminal, his public statements lay such doubt to rest.  For more than three years, Convertino has maintained a fundraising website at www.convertino.org.   On that site, Convertino has condemned Ashenfelter as a "criminal" who is <u>conspiring</u> with other "criminals" in the DOJ to tarnish Convertino's reputation and cover up criminal actions by DOJ officials.  For example, in one "story," published underneath the following headline:



**Detroit News Reporter is Protecting Criminals**

Convertino writes[12] that "*David Ashenfelter of the Detroit Free Press helped Federal Prosecutors commit a crime*, and is now aiding them by hiding their identities.  The leak of information that was published in [Ashenfelter's article] was a criminal violation . . . ."[13]  After repeating the word "criminal" several more

---

[12] Convertino has previously refused to admit to this Court that he is responsible for the content on <convertino.org>.  D/E 25 at 14 (describing statements on convertino.org as being "purportedly made by Mr. Convertino").  More recent iterations of the site, however, ask users to "Contact Us" in care of Convertino's wife, Valerie, at the offices of Convertino's personal law firm.  Ex B ("Contact Us" from www.convertino.org).  It now also reserves the "exclusive rights" to "Richard Convertino's life story."  *Id*.

[13] Ex C ("Detroit News Reporter is Protecting Criminals" from www.convertino.org) (emphasis added).

4

times for good measure, Convertino then goes so far as to claim that Ashenfelter's news story  "aided the terrorists much more than any other leak has."[14]

The point, of course, is that Convertino is no mere lay plaintiff throwing around epithets.  He is described by his complaint and subsequent filings as "a highly-skilled, effective and experienced"[15] federal prosecutor, albeit now a former federal prosecutor.  One has to assume that when such a person uses terms such as "criminal," "aiding," and "conspiracy," that he not only knows their meaning but that he intends to convey an informed legal belief as to their applicability to Ashenfelter.

**B.**     <u>**Ashenfelter Asserts the Fifth Amendment at His Deposition**</u>

On December 8, 2008, Convertino's attorney deposed David Ashenfelter.[16]  During that deposition, Convertino's counsel asked him several questions about the Article, how Ashenfelter obtained the "leaked" information, and the identity of Ashenfelter's source(s).[17]

In response to each of these questions, Ashenfelter recited the following invocation of his Fifth Amendment privilege against self-incrimination:

> <u>On advice of counsel</u> I decline to answer that question asserting my reporter's privilege under the First Amendment of the U.S. Constitution and Article I, Section 5 of the Michigan Constitution, federal common law and any other relevant federal or state statute, rule or case law protecting or creating a reporter's or news gatherer's privilege.  I also assert my rights under the Fifth Amendment to the U.S. Constitution as well as Article I, Section 17 of the Michigan Constitution and where relevant I will add the attorney/client privilege and work product document.[18]

---

14 *Id.*

15 Ex A (Complaint) at ¶ 11.

16 Deposition transcript attached as Exhibit 4 to Pl. Br. on Contempt [D/E 38].

17 *See generally id.*

18 *Id.* at p. 9-10 (emphasis added).

An article appearing on <convertino.org> after this deposition *continues* to ask, "Why is Ashenfelter now protecting the criminal acts done by the people who used him to further their own agendas? . . . Ashenfelter ought to write an article exposing his sources and their corrupt use of the media . . . ."[19]

### III.   ARGUMENT

**A.   Standards for Reviewing an Invocation of the Fifth Amendment Privilege**

> **1.   The Fifth Amendment Liberally Protects Witnesses From Being Forced to Provide Any Information That May Supply a Link in the Chain of Evidence Needed to Prove a Crime**

The Fifth Amendment to the U.S. Constitution provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself."  A witness may assert this privilege "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory."[20]  "[C]ourts have repeatedly held that the privilege against self-incrimination justified a person in refusing to answer questions at a deposition."[21]

"This provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure."[22]  "The privilege . . . not only extends to answers that would themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish *a link in the chain of evidence* needed to prosecute the claimant for a federal crime."[23]  Even the act of producing

---

19 Ex D ("Latest News" from www.convertino.org).

20 *Kastigar v. United States*, 406 U.S. 441, 445 (1972).

21 Wright, Miller & Marcus, Federal Practice & Procedure: Civil 2d § 2018, pp. 272-73 (internal citations omitted).

22 *Hoffman v. United States*, 341 U.S. 479, 486 (1951)

23 *Id.*; *United States v. Grable*, 98 F.3d 251, 256 (6th Cir.1996), *cert. denied*, 519 U.S. 1059 (1997) (emphasis added).

documents in response to a subpoena may be "sufficiently testimonial and incriminating to activate [a witness's] fifth amendment privilege."[24]

### 2.    The Privilege May Only Be Asserted Question-by-Question

Convertino is wrong to imply—as he does throughout his brief—that it was somehow unscrupulous or underhanded of Ashenfelter not to have asserted his Fifth Amendment privilege before his deposition. To the contrary, well-established law requires a witness to assert the privilege only on a question-by-question basis, as Ashenfelter did in his deposition:

> A blanket assertion of the privilege by a witness is not sufficient to meet the reasonable cause requirement and the privilege cannot be claimed in advance of the questions.  *The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify.*[25]

In fact, "a district court may not rule on the validity of a witness' invocation of the fifth amendment privilege against compulsory self-incrimination *until* the witness has asserted the privilege *in response to a particular question.*"[26]  Therefore, Ashenfelter asserted the privilege at his first and earliest opportunity.

### 3.    The Court Must Sustain the Privilege Unless It Is "Perfectly Clear" That Ashenfelter's Answer "Cannot Possibly" Help to Incriminate Him

"A witness invoking the privilege need not carry a burden . . . to persuade the judge that the answer sought would be incriminating."[27]  Rather, the court must accept the claim of privilege unless it is "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answers *cannot possibly* have such tendency to incriminate."[28]  "The right to assert one's privilege

---

24 *United States v. Argomaniz*, 925 F.2d 1349, 1356 (11th Cir.1991).

25 *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983) (emphasis added).

26 *U.S. v. Arnott*, 704 F.2d 322, 324-25 (6th Cir. 1983) (emphasis added).

27 1 MCCORMICK ON EVIDENCE (6th ed.) § 132 at p. 559; *Morganroth,* 718 F.2d at 169 ("[w]e do not hold, however, that a witness has the burden of proof on this issue").

28 *Hoffman v. U.S.*, 341 U.S. 479, 488 (1951) (emphasis original, internal quotations and brackets omitted).

against self-incrimination does not depend upon the *likelihood*, but upon the *possibility* of prosecution."[29] "[I]t is only where there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well taken."[30]

"The trial court must make this determination from the facts as well as from his personal perception of the peculiarities of the case."[31]   In many cases, the district court should be able to make such a determination on the face of the record, since the conceivability of incrimination will be evident.  "[T]he court does not need to inquire further as to the validity of the assertion of the privilege, if it is evident from the implications of a question, in the setting in which it is asked, that a responsive answer might be dangerous to the witness because an injurious disclosure could result."[32]

If the Court does choose to consider additional evidence in support of Ashenfelter's privilege, however, the Sixth Circuit requires only that this Court find a sufficient basis on which to *imagine the possibility* of Ashenfelter's criminal exposure:

> A witness presents sufficient evidence to establish a foundation for the assertion of the privilege and shows a real danger of prosecution if it is not perfectly clear to the court 'from a careful consideration of all of the circumstances in the case, that a witness is mistaken, and that the answer[s] cannot possibly have such a tendency to incriminate.'  Stated differently, **sufficient evidence is presented by a witness if a court can, by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution.**[33]

Obviously, this is an incredibly low standard of proof.  As shown below, Ashenfelter has more than satisfied it.

---

[29] *In re Master Key Litigation*, 507 F.2d 292, 293 (9th Cir. 1974) (citing *Hoffman*, 341 U.S. at 486-87) (emphasis added); *see also Doe v. Glazner*, 232 F.3d 1258, 1263 (9th Cir. 2000) ("'the privilege against self-incrimination does not depend upon the *likelihood*, but the *possibility* of prosecution' and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence.") (internal citations omitted).

[30] *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir. 1979).

[31] *Hoffman*, 341 U.S. at 487 (internal quotations omitted).

[32] *Morganroth*, 718 F.2d at 167 (citing *Hoffman*, 341 U.S. at 486-87).

[33] *Id.* at 169-70 (emphasis added).

**B.**     <u>Convertino's Arguments Fall Far Short</u>

**1.**     **Ashenfelter Need Not Lay the Groundwork**
**for the Privilege Before Asserting It**

Convertino's only direct attack[34] on Ashenfelter's Fifth Amendment privilege is to suggest—claiming to rely on the Supreme Court's *Hoffman* decision—that *"[b]efore* a witness is entitled to invoke the protection of the Fifth Amendment . . . that witness must first establish that their assertion of the privilege has a valid basis."[35]  But that is the *precise opposite* of the principle for which *Hoffman*, one of the Court's seminal Fifth Amendment decisions, stands.[36]

In *Hoffman*, a district court held a witness in contempt for refusing to answer deposition questions on the grounds of the Fifth Amendment privilege.  The Supreme Court reversed.  The Court did acknowledge that it is ultimately up to the trial court, not the witness, to decide whether the privilege is available.  But it also cautioned that "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee."[37]

Rather, *after* the privilege is asserted, it is the responsibility of the reviewing court, informed by the arguments of the parties[38] and any other available information, to weigh its legitimacy.  *Hoffman* instructs

---

[34] Convertino's briefs spend little space and limited argument on the Fifth Amendment issue—which is actually the only relevant issue before the Court.  He must not be permitted to raise new arguments in his reply brief, as that would severely limit Ashenfelter's ability to fairly contest them.  This is why argument not raised in an opening brief are deemed abandoned.  *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

[35] Pl. Br. on Contempt [D/E 38] at p. 9 (emphasis added).

[36] It is not even the witness's responsibility to seek judicial review of the privilege.  *See Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067 (6th Cir. 1990).

[37] *Hoffman*, 341 U.S. at 486.

[38] *In re Atterbury*, 316 F.2d 106 (6th Cir. 1963) (holding that the district court erred in holding a witness in contempt for refusing to answer questions on grounds of self-incrimination where the district court failed to allow the witness to show the connection between the questions asked and the possible violations of federal law to support his assertion of the Fifth and to demonstrate the "setting in which the questions were asked."); 1 McCormick on Evidence (6th ed.) § 132, p. 561 ("A trial judge would probably act impermissibly

that "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."[39]   This is particularly true where even seemingly innocuous questions nonetheless may  "harbor hidden dangers for the unwary witness,"[40] who may, by inadvertence, give an answer that waives his privilege against self-incrimination, his attorney-client privilege, or some other right.[41]   The same rationale justifies Ashenfelter's refusal to produce documents to Convertino, because to do so "would be establishing their existence and authenticity as well as verifying his possession of them."[42]

Therefore, by asserting his Fifth Amendment privilege "on advice of counsel" to every question which, according to that advice, could conceivably form a link in the chain of evidence against him,

in rejecting a witness's claim to the privilege without granting the witness's request for a factual hearing at which he would have an opportunity to establish the basis for his claim."). "Claims to privilege are often resolved on the basis of proffers of counsel…." *Id.* "*Hoffman* itself made clear a judge is not limited to the formal record in the case but may consider news media reports, general information and perhaps even factual information which he has from other sources." *Id.* Further, "[i]n an effort to minimize the risk that a witness will have to make incriminatory disclosures to establish that he is not required to so, some courts have entertained *ex parte* submissions and conducted *in camera* proceedings." *Id.*

[39] *Hoffman,* 341 U.S. at 486-87.

[40] *In re Corrugated Container Antitrust Litig.*, 662 F.2d 875, 884 (D.C. Cir. 1981) (ruling that facially innocuous questions concerning possession of documents nonetheless harbor risks of self-incrimination and, therefore, support assertion of the Fifth Amendment).

[41] *See, e.g., Anton v. Prospect Cafe Milano, Inc.*, 233 F.R.D. 216, 219-20 (D.D.C. 2006) (upholding witness' invocation of Fifth Amendment at his deposition because questions, even seemingly innocuous ones regarding his employment, the operation of the business and his relationship with the decedent, concern the witness' "involvement with, connection to, and knowledge of" the decedent could furnish a link in the chain and expose him to criminal liability).

[42] *United States v. Grable*, 98 F.3d 251 (6th Cir. 1996) (upholding refusal to produce documents under the Fifth Amendment); *see also Fisher v. United States*, 425 U.S. 391, 410 (1976) ("Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [witness]."); *United States v. Doe*, 465 U.S. 605, 612 (1984) ("The turning over the subpoenaed documents . . . would admit their existence and authenticity."); *Argomaniz*, 925 F.2d at 1356 (producing documents in response to a subpoena may be "sufficiently testimonial and incriminating to activate [a witness's] fifth amendment privilege"); *In re Kave*, 760 F.2d 343, 358 (1st Cir. 1985) (holding that witness's refusal to produce documents was protected by the Fifth Amendment because the production of the documents "could have constituted incriminatory testimonial acts").

Ashenfelter did exactly what the Supreme Court has said he should have done.  It is now up to the Court to determine if the assertion could conceivably be justified.  Convertino's motion papers have done nothing to satisfy his burden to show that an injurious disclosure "could not possibly" result, and Convertino himself has only underscored the legitimacy of Ashenfelter's assertion.

     **2.**     **Ashenfelter Need Not Be Aware of an Actual Investigation Against Him**

Convertino's claim that the privilege's availability here turns on "whether Mr. Ashenfelter was aware of any pending criminal investigations against him"[43] is not well-founded.  As a former prosecutor, Convertino surely knows that many, if not most, targets, subjects, or even persons of interest of government investigations are not aware of the investigation from its inception, if at all.  The preference for such secrecy is abundantly evident in the grand jury procedure provided for in Fed. R. Crim. Pro. 6 and the desire to prevent obstructionist conduct.  In any event, there was an investigation by the DOJ into the "leak," and everyone knows at least that much.  That investigation, which could still be open, could perhaps be expanded to include Ashenfelter (if, in fact, he is not already included) depending on what answers Ashenfelter gives to the questions Convertino's lawyer asked.

     **3.**     **The Mere Fact of Asserting the Privilege Does Not Create**
               **an Adverse Inference That Then Destroys the Privilege**

Convertino argues that "because Mr. Ashenfelter invoked the Fifth Amendment and refused to answer the foundational questions discussed above, Convertino is entitled to the inference that Mr. Ashenfelter did so because he knew he had no basis to assert the privilege."[44]  This suggestion is illogical in the extreme.  As demonstrated above, Ashenfelter has no such duty to lay a factual predicate for his privilege at the deposition itself.  Convertino's argument to the contrary would whipsaw a witness, placing him in the impossible conundrum of either (a) not explaining his factual basis, and thereby losing the

---

43 Pl. Br. on Contempt [D/E38] at p. 10.
44 *Id.* at 12.

benefits of the privilege through an adverse inference, or (b) testifying under oath as to the privilege's factual basis, thereby running the risk of waiving the privilege by exposing too much information. Convertino's view of the law, therefore, essentially renders the entire Fifth Amendment privilege a nullity.

The primary case that Convertino relies on for this argument—Magistrate Judge Pepe's opinion in *NCS Pearson, Inc. v. McGrath & Assocs.*[45]—actually says the *exact opposite*, which further exposes the logical disconnect in Convertino's view of the law.  That decision denied a motion which, like this one, sought to compel the testimony of two non-party deponents who asserted the Fifth Amendment.  And, like here, the plaintiff in that case asked that "adverse inferences be drawn from the [non-party] deponents' assertion of their Fifth Amendment privilege."[46]  "*Yet there is no support for Plaintiff's arguments*,"[47] Magistrate Judge Pepe held, "which appear to be that a witness' refusal to testify on Fifth Amendment grounds can be used . . . against the *witness* to prove the truth of the matter asserted in the individual question the witness refuses to answer . . . ."[48]  Instead, adverse inferences may only be drawn against "*a party to a civil cause.*"[49]  This is only logical, since an adverse inference serves to prove the truth of a material fact being asserted *against* the party who refuses to dispute it.  Convertino's reliance on this holding, therefore, is misplaced.

## C.   Ashenfelter's Assertion of the Fifth Amendment Privilege Was Amply Justified

Ashenfelter had "reasonable cause to apprehend a real danger of incrimination"[50] that supports his assertion of the Fifth Amendment, for at least the following reasons.

---

[45] 2006 U.S. Dist. LEXIS 34849 (E.D. Mich. May 31, 2006).

[46] *Id.* at *18.

[47] *Id.* at *20 (emphasis added).

[48] *Id.*

[49] *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (emphasis original), also cited by Convertino.

[50] *In re Morganroth*, 718 F.2d at 167 (citing *Hoffman,* 341 U.S. at 486).

1.     **Ashenfelter Could Be Charged With Conspiracy or Other Indirect Liability**
       <u>**for Any Crime Committed by a Government Official**</u>

"If two or more persons conspire either to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under [18 U.S.C. § 371] or imprisoned . . . ."[51]   The scope of this statute is notoriously broad, to say the least. Therefore, even if an underlying crime was perpetrated by a government official, Ashenfelter could still be prosecuted for conspiring with that person.  Convertino, who describes himself as a "highly skilled"  former federal prosecutor who knows the scope of § 371, has repeatedly and publicly accused Ashenfelter of doing exactly that.

Federal law contains many other methods for punishing indirect criminal behavior.  For example, aiding and abetting a federal offense is punishable under 18 U.S.C. § 2, while 18 U.S.C. § 3 criminalizes the actions of one who "receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."   Concealing another person's commission of a felony, or "misprision," is also a crime.[52]  Any of these statutes could conceivably also be used to prosecute Ashenfelter for any crime for which his source(s) may be prosecuted.

2.     <u>**Direct or Indirect Violation of the Privacy Act**</u>

In his Complaint, Convertino seeks damages for violations of the Privacy Act.  The Privacy Act imposes criminal penalties on the government employees who have leaked information to unauthorized persons:

> (i)(1) Criminal penalties.--Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to

---

[51] 18 U.S.C. § 371.
[52] 18 U.S.C. § 4.

any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.[53]

To request or obtain such material "under false pretenses" is also a misdemeanor.[54]

As set out above, Convertino alleges that DOJ officials violated this provision by leaking to Ashenfelter documents and other information containing the identity of a confidential terrorism informant and about the OPR investigation of Convertino.  In his D.C. lawsuit, these proceedings, and on his fundraising website, Convertino has specifically and repeatedly labeled these offenses "criminal."

Convertino has also specifically branded Ashenfelter as a co-conspirator and participant in, and accessory to, these "crimes."  If Convertino's allegations are true, then Ashenfelter faces the possibility of accessorial prosecution under the Privacy Act and these statutes.

3.    **Perjury, False Statements, and Obstruction of Justice**

As Convertino has already informed the Court, the DOJ has already conducted a criminal investigation to identify Ashenfelter's source, and everyone interviewed denied involvement.  If it turned out that—as Convertino has insisted—one or more of those persons lied under oath, such persons could face perjury[55] or false statement[56] charges (Ashenfelter does not know if those persons interviewed were placed under oath or not), in addition to prosecution under the Privacy Act.  That would increase the likelihood of prosecution against one thought to have suborned such perjury,[57] or otherwise to have been a co-conspirator, aider, abettor, or accessory to such person(s).  Convertino continues to say publicly that Ashenfelter is helping "criminals" cover their "crimes."  If it could be alleged by the DOJ that Ashenfelter

---

[53] 5 U.S.C. § 552a(i)(1).

[54] 5 USC § 552a(i)(3).

[55] 18 U.S.C. §§  1621 (perjury) & 1823 (false declaration before grand jury or court).

[56] 18 U.S.C. § 1001 (punishing one who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact [or] makes any materially false, fictitious, or fraudulent statement or representation").  The punishment increases if, as Convertino alleges here, "the offense involves international or domestic terrorism."  *Id*.

[57] 18 U.S.C. §  1622.

persuaded his source(s) to give false statements, then Ashenfelter could be prosecuted for obstruction of justice.[58]

The threat of such prosecution is hardly "fanciful."  Indeed, the very fact of the DOJ's prosecution against Convertino is itself extraordinary.  In the course of introducing National Public Radio's recent, sympathetic interview of Convertino, the host of *This American Life* argued that the very fact that Convertino was prosecuted for his misconduct is itself "unheard of."[59]  If the DOJ elected to prosecute a prosecutor—perhaps because Convertino's misdeeds were such an embarrassment to the DOJ, or because of the terrorism-related nature of the case, or, as Convertino would have it, because of Convertino's outspoken opposition to DOJ policies—it is certainly credible to believe that if the DOJ, through Convertino's lawsuit, learned who the source was, it would prosecute that person and anyone who aided, abetted, conspired with, or covered up for that person.  This is particularly true in light of public statements by the last three U.S. Attorneys General (Ashcroft, Gonzales and Mukasey) that journalists could be prosecuted and imprisoned for publishing confidential government information.[60]  Whether or not such a prosecution is likely is irrelevant[61]—Ashenfelter's fear of the "possibility of prosecution" prosecution is hardly "imaginary" or "fanciful" in light of what happened to Convertino himself.

---

[58] 18 U.S.C § 1510 (obstruction of criminal investigation); *see also U.S. v. Leisure,* 844 F.2d 1347 (8th Cir. 1988), *rehearing denied, cert. denied*, 488 U.S. 932 (holding that to violate statute governing obstruction of criminal investigations, it is only necessary for defendant to have believed that witness might give information to federal officials and to have prevented that communication); 18 U.S.C. § 1512 (witness tampering) (punishing "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct").

[59] Ex E (National Public Radio, *This American Life,* "The Prosecutor," 5/30/08).

[60] Ex F (Articles Regarding Attorney General Statements re: Prosecuting Journalists); *see also* discussion of Espionage Act, *infra*.

[61] *Cf. LeBlanc v. Spector*, 378 F.Supp. 310 (D.C. Conn. 1974) (holding that civil defendant was justified in invoking Fifth Amendment where he feared prosecution for violation of statute forbidding persons not authorized to practice before the Patent Office from representing themselves as qualified to prepare patent applications); *deAntonio v. Solomon*, 42 F.R.D. 320 (D. Mass. 1967) (upholding witness's assertion of Fifth Amendment, and denying motion to hold witness in contempt, where although the risk that she would be prosecuted for committing adultery with the defendant was "remote" it was not "purely fantastic" and,

4.    Related Federal Statues Concerning Possession and Disclosure of Documents

There are other related crimes for which the alleged DOJ source(s) face the possibility of prosecution and for which Ashenfelter, too, "could" be prosecuted based upon a conspiracy, aiding and abetting or accessory after the fact theory.  For instance, these officials may be guilty of violating 18 U.S.C. § 1905, which criminalizes the disclosure of various forms of confidential government information.  An individual violates § 1905 if "(1) the defendant was an officer or employee of the United States; (2) the defendant disclosed confidential information; and (3) the defendant knew that the information so disclosed was confidential 'in the sense that its disclosure is forbidden by agency official policy (or by regulation or law).'"[62]  Or, if the information was classified, the officials may have violated 18 U.S.C. § 1924, which prohibits the unauthorized removal and retention of classified documents.[63]

Ashenfelter was asked at his deposition if he was "aware if any documents in any way covered by the subpoena…have been destroyed."[64]  This, too, could form a link in the chain of evidence supporting a prosecution under 18 U.S.C. § 2071(a), which prohibits the destruction or attempted destruction of government records, which is punishable by imprisonment up to three years, or a prosecution under one or more obstruction statutes if it were alleged that documents responsive to a process were destroyed after receipt of that process, or were destroyed upon a person being made a party to, or a nonparty witness in, a proceeding.

---

therefore, witness was justified in refusing to produce her passport which could provide evidence that she and the defendant had traveled together).

[62] UNITED STATES ATTORNEY CRIMINAL RESOURCE MANUAL § 1665 (citing *United States v. Wallington*, 889 F.2d 573, 578 (5th Cir. 1989)).

[63] 18 U.S.C. § 1924 ("(a) Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than one year, or both.")

[64] Deposition Transcript at 19.

16

5.      **Theft and Receipt of Government Information or Records**

Similarly, Ashenfelter could be prosecuted under 18 U.S.C. § 641, which governs the theft and receipt of "public money, property or records" (or a conspiracy to violate that statute, or as an aid, abettor, or accessory to such an offense).  Section 641 provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted--
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

Officials have been prosecuted under this provision for giving government reports and information to the press.[65]  The statute of limitations for this offense is five years,[66] and would not yet have begun to run if Ashenfelter still possessed the documents he is alleged to have received.[67]  Therefore, Convertino has not met his burden to prove that Ashenfelter, as the alleged recipient of confidential government documents and other information, does not reasonably fear prosecution under 18 U.S.C. § 641 (or for concealing another's commission of such an offense).

---

[65] *See U.S. v. Morison*, 844 F.2d 1057 (4th Cir. 1988) (affirming conviction).

[66] 18 U.S.C. § 3282.

[67] *See U.S. v. Blizzard*, 812 F.Supp. 79 (E.D. Va. 1993), *aff'd*, 27 F.3d 100 (4th Cir. 1994).

6.      **The Espionage Act and Disclosure of Confidential Information**

Convertino alleges that Ashenfelter's Article harmed national security and the "War on Terrorism" by, among other things, disclosing the identity of Convertino's confidential terrorism case informant, thereby hampering the government's ability to learn about future terrorist attacks and recruit other such informants in the future.[68]  Moreover, the OPR report that Convertino alleges was given to, and partially republished by, Ashenfelter may well have contained additional classified or confidential, terrorism-related information.

Ashenfelter's fear that the DOJ might attempt to prosecute him under this theory is quite reasonable.  As noted above, the three most recent Attorneys General have all opined that journalists could be prosecuted and imprisoned for publishing confidential government information.[69]  For example, Attorney General Alberto Gonzales suggested that journalists from the *New York Times* could be prosecuted for publishing classified information concerning leaks about the National Security Agency's surveillance of terrorists.[70]  It is conceivable that the DOJ would choose to prosecute such actions under the Espionage Act, which provides that it is a crime for an unauthorized person to transmit or receive national defense information, or to conspire to do so.[71]  Disclosure of classified information pertaining to intelligence

---

[68] Ex A (Complaint) at ¶ 125.

[69] Ex F (Articles Regarding Attorney General Statements re: Prosecuting Journalists).

[70] *Id*.

[71] *See, e.g.,* 18 U.S.C. §§ 793(b) (punishing one who "copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any . . . document, writing, or note of anything connected with the national defense"); 793(c) (punishing one who "receives or obtains or agrees or attempts to receive or obtain from any person, or from any source whatever, any document. . .  or note, of anything connected with the national defense"); 793(d) (punishing one who, "lawfully having possession of, access to, control over, or being entrusted with any document . . . relating to the national defense . . . willfully communicates, delivers, transmits . . . the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it"); 793(e) (punishing "Whoever having unauthorized possession of, access to, or control over any document . . .  or information relating to the national defense . .  willfully communicates, delivers, transmits or causes to be communicated"); 793(g) (punishing conspiracy to do any of the above).

gathering is likewise punishable.[72]  Nor is this theory of prosecution an invention of the 21st Century; two of the Supreme Court Justices who decided the Pentagon Papers Case[73] expressed the view that the *New York Times* could be prosecuted for violating the Espionage Act, and several journalists actually were jailed under the Act shortly after it passed.[74]

More recently, two officials of the American Israel Public Affairs Committee ("AIPAC") were jailed and charged under the Espionage Act for receiving information from an official source (a former Pentagon analyst) and transmitting it to others, including reporters.[75]  This is exactly what journalists such as Ashenfelter do every day, as the Reporters Committee for Freedom of the Press noted in its motion for leave to file an amicus brief:

> The indictments in this case raise issues that could well affect the very nature of how journalism can be practiced.  The defendant private citizens have been charged for conspiring to "communicate" national defense information "to any persons not entitled to receive it." 18 U.S.C. §793(d).  Overly broad, this language applies to any private party who speaks about national defense information regardless of their intent or whom they speak to.  These charges potentially eviscerate the primary function of journalism – to gather and publicize information of public concern – particularly where the most valuable information to the public is information that other people, such as the government, want to conceal. * * *
>
> Irrespective of the merits of the defendants' case, these indictments place reporters in a precarious position.[76]

The trial judge in the AIPAC case, although he denied the Committee's motion, expressed his view on the record that the Act could be "applie[d] to academics, lawyers, journalists, professors, whatever."[77]  In connection with the same case, the FBI has begun making "unprecedented" requests for journalists' files as

---

[72] 18 U.S.C. § 798.

[73] *New York Times v. U.S.*, 403 U.S. 713 (1971).

[74] Ex G (*Reporters or Spies?*, Nov. 1, 2006).

[75] Ex H (Superseding Indictment in *U.S. v. Franklin, et al.* No. 1:05CR225 (E.D. Va)).

[76] Ex I (Oct. 12, 2005 Motion and related articles).

[77] Ex J (various articles).

part of its investigation.[78]  All of these developments have led to tough questions of the FBI Director from Congress over the extent of the executive branch's power to prosecute news reporters.[79]

Under these circumstances, it is certainly conceivable that the DOJ could view the transaction between Ashenfelter and his source(s) as materially identical to that in the AIPAC case, and prosecute them accordingly.

### 7.    Criminal Contempt of Court Order

In addition to alleging the criminal nature of the disclosure to Ashenfelter, Convertino alleges that the alleged release was a willful violation of a sealing order issued by the district court handling the sentencing of Convertino's confidential informant.[80]  "Any person. . . willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia . . . if the act or thing so done be of such character as to constitute also a criminal offense under any statute of the United States or under the laws of any State in which the act was committed, shall be prosecuted for such contempt."[81]

### 8.    Receipt, Possession, or Concealing of Stolen Property, M.C.L. 750.535

The facts that Convertino alleges also support prosecution under the state criminal laws that mirror those federal statutes cited above.  These include, but are not limited to, M.C.L. § 750.535 ("A person shall not buy, receive, possess, conceal, or aid in the concealment of stolen, embezzled, or converted money, goods, or property knowing, or having reason to know or reason to believe, that the money, goods, or property is stolen, embezzled, or converted.")  "It is well settled that the privilege protects a federal witness against incrimination under state as well as federal law."[82]

---

[78] Ex K (*The Big Chill*, May 1, 2006).

[79] Ex L (*Senators examine legal authority for prosecuting media*, June 6, 2006).

[80] Ex A (Complaint) at ¶ ¶ 80-82.

[81] 18 U.S.C. § 402.

[82] *United States v. Seavers*, 472 F.2d 607, 610 (6th Cir. 1973) (citing *Malloy v. Hogan*, 378 U.S. 1 (1964)).

**D.**     **Even If This Court Finds That Ashenfelter's Asserted Privilege Is Invalid, Convertino's Requested Relief Is Unjustified**

**1.**     **Contempt and Coercive Sanctions Are Premature**

The Court may use its contempt power to enforce its orders—but Ashenfelter has not disobeyed any such order.  As noted above, the Fifth Amendment privilege may only be asserted in response to specific questions.  A witness cannot claim it in a blanket, pre-emptive fashion.  Therefore, his December 2008 deposition was Ashenfelter's first opportunity to assert the privilege, and this is the Court's first opportunity to adjudicate it.  Even if the Court invalidates some or all of Ashenfelter's privilege, it must at least first give him another opportunity to testify before holding him in contempt.

Convertino's request for sanctions stemming from Ashenfelter's assertion of the Fifth Amendment fails for similar reasons.  If Ashenfelter legitimately asserted the privilege, there is nothing to coerce or punish—he cannot be forced to incriminate himself.  If the Court invalidates the assertion, it must first order Ashenfelter to testify over his Fifth Amendment objection.  In that event, Ashenfelter respectfully requests the opportunity to brief the appropriateness of any sanction at that time.

**2.**     **Convertino's Requested Contempt Sanctions Are Excessive in Any Event**

Convertino requests "exactly the sanctions that the D.C. District Court imposed in the nearly identical case of *Hatfill v. Mukasey,* [*i.e.,* a non-reimbursable,] escalating fine of $500/day for the first seven days that Mr. Ashenfelter stands in contempt, escalating to $1,000/day for the next seven days, and then $5,000/day thereafter until Mr. Ashenfelter complies with Mr. Convertino's subpoena."[83]  Yet Convertino overlooks the fact that the reporter in *Hatfill* relied only on the First Amendment (not the Fifth), and that the D.C. Circuit Court granted an emergency stay of this draconian sanctions order, after holding that the reporter "satisfied the stringent standards required for" such relief.[84]  Moreover, after the case was settled

---

[83] D/E 38 at 14-15.

[84] Ex M (*Hatfill v. Mukasey*, No. 08-5049, 2008 U.S. App. LEXIS 5755 (Mar. 11, 2008)).

and dismissed, the circuit court vacated the contempt finding against the third-party reporter.[85]  Convertino

cites no other authority for such an extreme measure in a case like this, because there is none.

It is also noteworthy that in the course of vacating the contempt finding in *Hatfill*—which Convertino

describes as "nearly identical"[86] to this case—the circuit court went out of its way to suggest that the facts

presented a "close question" that did not justify such one-sided relief:

> This appeal raised close questions [concerning the Reporter's Privilege] under Fed. R.
> Evid. 501 and the First Amendment, including whether the appellant had a defense, which
> required analysis of the appellee's efforts to obtain the information from alternate sources
> and need for disclosure of the appellant's sources, as compared to the appellant's interest
> in concealing her sources in order to protect the workings of the press.[87]

Ashenfelter likewise asserted a Reporter's Privilege emanating from FRE 501 and the First Amendment.

Even though this Court disagreed with Ashenfelter's arguments, it is likely that the Sixth Circuit (which has

never before considered the issue under FRE 501, or in a civil case) would likewise see this as at least a

"close question" that merits careful legal review, not draconian punishment.

Any fine imposed by the Court should be nominal when, as here, the issue before the Court has

not been addressed by any appellate court.[88]  In such cases, courts have entered *de minimis* fines pending

appeal in light of the seriousness of the constitutional questions involved. As Ashenfelter demonstrated in

response to Convertino's motion to compel, at least four other Michigan federal judges, including one who

is now a member of the Sixth Circuit, have disagreed with this Court's reasoning and found a Reporter's

---

[85] Ex N (*Hatfill v. Mukasey*, No. 08-5049, 2008 U.S. App. LEXIS 23804 (D.C. Cir., Nov. 17, 2008)).

[86] D/E 38 at 15.

[87] Ex N at *6.

[88] *See, e.g., United States v. Cutler*, 6 F.3d 67, 70 (2d Cir. 1993) (upholding contempt fine of $1.00 per day imposed on reporters and television stations for refusing, on reporter's privilege grounds, to provide unpublished notes, outtakes and testimony in criminal contempt proceeding); *United States v. Cuthbertson*, 630 F.2d 139, 143 (3d Cir. 1980) (upholding contempt fine of $1.00 per day imposed on CBS for refusing, on reporter's privilege grounds, to produce for in camera review by the court, statements of potential government witnesses in a criminal trial), *cert. denied*, 449 U.S. 1126 (1981).

Privilege.  Although Ashenfelter respects this Court's decision, he ought to be able to at least present this complex legal issue for appellate review before being punished for contempt.

**E.**   **Convertino's Various and Sundry Requests for Sanctions Are Unfounded**

   **1.**   **Convertino Has Consistently Salted the Record With Uncivil and Unfounded Accusations in Order to Taint the Court's Perception of Ashenfelter**

Convertino's motion is a regrettably uncivil hodgepodge of petty finger-pointing and other tempests in teapots.  As he has already done too many times to recite, Convertino's most recent motion simply repeats the mantra that Ashenfelter is "sandbagging" and filing motions in bad faith to delay discovery. Mere repetition, however, cannot make this true, nor can Convertino lend credibility to his assaults on Ashenfelter's character, and that of his counsel, just by making more of them.  For example, no matter how many times Convertino asserts that Ashenfelter said publicly in an AP article that he would never answer Convertino's questions, it is simply not true.  That sentence of the article did not appear between quotation marks; it was the AP reporter's interpretation of motion papers filed by Ashenfelter's attorneys.[89]

Convertino's counsel, Mr. Kohn, has also made a habit of unnecessary and untrue attacks on Ashenfelter's counsel, Mr. Fink.  For example, in opposing Ashenfelter's December 1, 2008 emergency motion for protective order, Mr. Kohn *directly stated* to this Court with regard to the place of deposition that "counsel for Mr. Ashenfelter did not attempt to address these issues without Court involvement," and if that if they had, Mr. Kohn would have been "willing to convene the deposition at an alternative venue . . . as a matter of professional courtesy."  Mr. Kohn neglected to mention, however, the email exchange he had with Mr. Fink's partner, Richard Zuckerman, *a week earlier*, in which Mr. Zuckerman requested that exact courtesy.  Mr. Kohn responded:

---

[89] D/E 30 Ex. 3.

23

Dear Richard: . . . I appreciate your desire to have the deposition conducted in your office. However, **conducting the deposition [sic] at the Law Office of Richard Convertino will save my client expenses, so we will conduct the deposition [sic] at that office.**[90]

This is *precisely the opposite* of the factual representations that Mr. Kohn has made to this Court.

2.     <u>**Neither Rule Cited by Convertino Applies Here**</u>

a.     <u>***Convertino Did Not Follow Rule 11's Prerequisites***</u>

Convertino bases his sanctions requests on civil court rules 11 and 37. But neither fits the facts of this case. As this Court is well aware, Rule 11 forbids the filing of any paper "presented for an improper purpose," and requires that all legal arguments be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." But the rule contains a "safe harbor" provision that gives the party opposing the motion 21 days after service of a motion for sanctions to withdraw a challenged paper, and warns that a motion for sanctions "must not be filed or be presented to the court if the challenged paper . . . is withdrawn or properly corrected" within that time frame.[91]

Convertino does not even pretend that he served his sanctions motion on Ashenfelter before filing it with the Court, much less the required 21 days before. Instead, he couches his reliance on Rule 11 as a mere "suggestion" that the court rely on its power under Rule 11(c)(3) to issue a show cause order on its own initiative. Such a "non-motion" motion is an impermissible attempt to do an end-run around the procedural requirements of Rule 11.

---

[90] Ex O (emphasis added).
[91] FED. R. CIV. P. 11(c)(2).

### b.    *Rule 37 Only Punishes Objectively Unreasonable Conduct*

Rule 37 does not fit well here either.  Convertino relies primarily on Rule 37(a)(5), which allows for sanctions against a deponent who resists a motion to compel or loses a protective order motion.  But most of the conduct Convertino deems sanctionable stems from motion practice other than his motion to compel or Ashenfelter's protective order request.

More importantly, however, and as Convertino notes, the Court "must not order" Rule 37 sanctions if Ashenfelter's positions were "substantially justified, or other circumstances make an award of expense unjust."[92]  As his motion notes, an argument is "'substantially justified' if it raises an issue about which 'there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'"[93]  The Sixth Circuit carefully reviews any award made under this rule:

> This circuit has adopted a four-factor test to determine whether a district court's decision to impose sanctions under Rule 37 amounts to an abuse of discretion:  The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered.[94]

In sum, both of these rules are meant to punish frivolous, bad faith argumentation.  As discussed below, Ashenfelter has not taken any action in this case that he did not believe was "substantially justified" and in good faith, even if, in the end, the Court disagreed with Ashenfelter's arguments.  Convertino does not describe conduct that this Court has previously found it necessary to warn Ashenfelter about, nor has Convertino suffered any cognizable prejudice.

---

[92] FED. R. CIV. P. 37(a)(5).

[93] Doe v. Lexington-Fayette Urban County Gov't, 407 F.3d 755, 765 (6th Cir. 2005) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).

[94] *Id.* at 765-66.

3.   **Ashenfelter Has Done Nothing Sanctionable**

a.   ***Opposition to the Motion to Compel***

Convertino goes so far as to make the baseless claim that "no reasonable person" could have believed Ashenfelter's reliance on the qualified Reporter's Privilege under the First Amendment and FRE 501.  Of course, if that were true, then current Sixth Circuit Judge McKeague, not to mention Judges Edmunds, Rosen, and Harvey of this court, must be counted as "unreasonable," since each of them found and enforced a similar privilege under the law of this circuit.  It would also apply to the judges of nine circuit courts that have recognized such a privilege—decisions that informed this Court's consideration of whether such a privilege exists in this circuit under the common law of FRE 501.  Simply because this Court disagreed with Ashenfelter's arguments does not render them "substantially unjustified."

b.   ***Motion for Protective Order and Remission (D/E 28)***

Convertino argues that Ashenfelter's request for a protective order was unjustified because (i) it did not raise any issues that were not raised in opposition to the motion to compel, (ii) it did not recite the standards for granting protective orders; (iii) it was an improper "appeal" to the D.C. district court, (iv) the Court had already ruled that the motion was unwarranted, and (v) Ashenfelter did not properly seek consent before filing it.  Each argument is false.

First, Convertino neglects to mention that Ashenfelter's motion to this Court was primarily one for *remission*.  It did request a protective order, but only in the form of an order that would stay proceedings in this matter pending action by the D.C. court on a simultaneously filed motion, and then adopt any protective order that the D.C. court issued.  That request did not require Ashenfelter to raise before this Court any additional facts beyond what Ashenfelter argued in opposition to the motion to compel, nor did it require a boilerplate recitation of protective order case law.  It *did* call for, and Ashenfelter did provide, a discussion of the concept of remission—which, as Ashenfelter made clear, is a routine act of judicial deference, not an appeal.

26

Second, as Ashenfelter has previously explained, he acted in good faith by raising all of his arguments that supported his protective order request in response to Convertino's motion to compel. Ashenfelter did not believe that this Court would have resolved Ashenfelter's arguments any differently if he raised them in a paper called "Response Brief" or one called "Motion for Protective Order." Indeed, by combining his arguments into one response, Ashenfelter did exactly what he believed this Court *ordered* him to do.[95] He raised all of his legal objections to the deposition sought by Convertino in response to Convertino's motion to compel. Ashenfelter believed and argued in good faith that this Court had the power to rule on these objections. But this Court decided instead that it could not decide some of Ashenfelter's key arguments—namely, that it could not take into consideration the merits of Convertino's case in chief.[96] Only then did Ashenfelter conclude that the D.C. court—which does have jurisdiction to decide such issues—should hear his protective order motion.[97]

Convertino is mistaken to suggest that Ashenfelter "stated his preference for the laws of this Circuit" by not "consent[ing] to Mr. Convertino's original [D.C.-issued] subpoena."[98] As Convertino himself has admitted, that subpoena was defective *ab initio*, because the D.C. court had no jurisdiction over Ashenfelter, a resident of this district. (The same is true of the next tactic Convertino tried—a D.C.-issued, Rule 30(b)(6) deposition notice to the corporate parent of Ashenfelter's employer.) Rule 26 permits

---

[95] *See* D/E 15 ("IT IS FURTHER ORDERED that . . . Ashenfelter and Detroit Free Press shall file their joint amended response to Plaintiff's motion by March 26").

[96] Specifically, the Court considered it "putting the cart before the horse" to consider the relative merits of Convertino's case when ordering the discovery in this matter. Ashenfelter may have misunderstood what the Court intended to convey with this statement, as the Court later suggested, but that does not make Ashenfelter's construction of the Court's words impermissible. That is why Ashenfelter's motion to Judge Lamberth asked him to delay Convertino's proposed discovery as an exercise of his inherent case-management powers, in the interest of judicial economy. Obviously, that is something that only Judge Lamberth can do.

[97] Convertino previously suggested that Ashenfelter should have simply re-filed the protective order motion he filed on August 31, 2007. If Convertino had re-read that motion, however, he would have seen that it was based entirely on the fact that, at that time, the D.C. case had been stayed pending Convertino's criminal trial. That is obviously inapposite now.

[98] D/E 39 at 14.

Ashenfelter to seek a protective order from the D.C. court, but it does not waive the constitutional prerequisite of personal jurisdiction.  Ashenfelter asked of Convertino no more than what the law required.

Third, this Court did not rule in its August 29, 2008 opinion that Ashenfelter was "not entitled" to a protective order.  Rather, it said that "there is no indication that Ashenfelter is entitled to a protective order under Rule 26(c)."[99]  Ashenfelter's subsequent motion was intended to be that indication.  But again, the Court's August 29 order was the first time that this Court suggested that it may have considered the issues differently if couched under Rule 26, and the first time that it suggested that it could not consider some of Ashenfelter's arguments.  Therefore, reasonable minds could have agreed with Ashenfelter's decision to seek remission, even though this Court chose in its discretion not to grant it.

Fourth, Ashenfelter properly sought consent before filing the motion.  In a September 5 email to Mr. Fink, Eric Snyder from Kohn's office identified himself as a recent law school graduate who "just took the bar and will be taking over most of the day to day litigation in this case just as soon as the results are posted."[100]  From that time forward, Fink dealt primarily with Snyder, as Kohn himself suggested.[101]  So when it came time to file Ashenfelter's motion, Fink called Snyder to seek consent.

Snyder told Fink that Kohn was on his way to the airport and unreachable, and that he could not consent.  On this basis, Fink filed the motion, noting that Snyder had refused (the original "not" was a typo).  At 4:13 p.m. *the same day*, Kohn also explicitly refused consent.[102]  He also reminded Fink of Snyder's bar status.  Fink had forgotten this detail, since he had been dealing with Snyder as Kohn's representative for over a month.  He apologized and amended the motion to say that Kohn had subsequently reiterated Snyder's refusal to consent.  But Kohn made it very clear that he would not have consented in any event.

---

[99] D/E 27 at 20.

[100] D/E 32 Ex. I.

[101] D/E 32 Ex E.

[102] D/E 32 Ex J.

Fink fulfilled the letter and purpose of the rule by seeking concurrence before filing.  He met the requirement simply by leaving a message for Kohn with Snyder, who obviously relayed it to Kohn in short order.  Moreover, given Kohn's same-day response, Fink could have simply withdrawn and re-filed his motion, all on October 13; instead, he simply updated the Court on the parties' conversations.  This caused Convertino no prejudice.

        ***c.***        ***Motion for Reconsideration of the November 7, 2008 Order (D/E 32)***

Convertino suggests that this November 10, 2008 filing was sanctionable because (i) it merely repeated previously-rejected arguments, (ii) it made a "willful mischaracterization" of footnote 16 of the Court's August 29, 2008 order, ignoring the Court's November 7, 2008 clarification of that footnote, and (iii) Ashenfelter's counsel did not meet and confer before filing it.  These arguments also fail.

First, Ashenfelter explained in the first paragraph of his reconsideration motion at least two reasons why it was not merely repeating what had been said before: because (i) the Court based its November 7, 2008 order on incomplete information, given that it was issued before Ashenfelter's deadline to file a reply brief that would have answered Convertino's misleading arguments; and (ii) it informed the Court of Convertino's own effort to involve the D.C. court in these issues, which undermined many of Convertino's arguments.

Second, Ashenfelter did not ignore the Court's November 7 explanation of "footnote 16."  To the contrary, Ashenfelter specifically tailored his comments in response to it:

> Ashenfelter argues that the last sentence of the Court's discussion in D/E 27 at 20 n.16 contains a typographical error.  It appears to have been intended to say, "[t]here is no known authority for this court, having ***no*** jurisdiction over the underlying suit . . . ."  The Court's discussion of this footnote in its November 7, 2008 Order does not directly resolve whether or not this reading is correct.[103]

---

[103] D/E 32 at 4 n.4.

It is irrelevant for current purposes that the Court disagreed with Ashenfelter's reading of the August 29 order.   This simply demonstrates that Convertino's accusations of "willful mischaracterizations" are baseless.

Third, Local Rule 7.1 requires a "movant [to] ascertain whether the contemplated motion . . . will be opposed."  As Convertino admits, he had no right to oppose the motion for reconsideration.  Reasonable minds could therefore believe that the rule does not apply to reconsideration motions.

### d.   _Emergency Motion Regarding Video Deposition (D/E 34)_

Convertino calls this filing sanctionable because Ashenfelter's counsel filed the motion before they were able to reach Convertino's counsel on the phone.  That is baseless, as evidenced by the timeline that Convertino recites and the email exchange attached to Convertino's response.[104]  The motion concerned the method by which Convertino had already indicated he would take Ashenfelter's deposition.  It was filed only 7 days before the deposition was set to occur.  Ashenfelter's counsel waited 4 hours after leaving a voice message for Convertino's counsel, and one hour after sending him a detailed email, before filing it. The rule only requires Ashenfelter to recite the "reasonable efforts" he made to contact opposing counsel, even if those efforts fail.  That is what he did.

### e.   _Deposition Scheduling in October 2008_

Convertino asserts that the parties "agreed" on an October 16 deposition, and that Ashenfelter filed his protective order motion only after being informed that Convertino's counsel, Mr. Kohn, had bought an airline ticket from D.C. to Michigan.  In reality, Kohn twice said that he chose this date because he would already be in Michigan for an unrelated case.[105]  Ashenfelter's counsel, Mr. Fink, listed the 16th as one _potentially_ available date, subject to later confirmation.[106]  On September 12, Kohn said he "would like to

---

[104] D/E 36.

[105] D/E 32 Exs E, F.

[106] D/E 32 Ex G.

confirm this date (or a mutually agreeable alternative . . .)"[107]   But Fink never did confirm that he and

Ashenfelter would, in fact, attend.  Rather, as he explained to Kohn on October 13, he would have notified

Kohn of the impending motions even earlier, but for a family medical emergency.[108]   Nor did Kohn *ever*

bother to *notice* the deposition, as required by Rule 30(b)(1), even after the October 13 motion was filed.

### f.   <u>Assertion of the Fifth Amendment in December 2008</u>

This argument is addressed above.  It bears noting, however, that Ashenfelter's counsel warned

Convertino's counsel well in advance of the deposition—for the express purpose of saving time and

expense--that Ashenfelter could assert privileges and would do so question-by-question:

> As for the deposition itself, we cannot tell you in advance of same what questions
> Ashenfelter will answer, if any, nor what privileges might be applicable to some or all of
> your questions. Our understanding of the assertion of privilege is that it must be asserted
> question by question and a deponent cannot simply assert a blanket refusal to answer all
> questions, pre deposition, as a means to avoid the deposition. We tell you this as a
> courtesy so you can guide yourself accordingly about coming to Detroit versus electing to
> take a telephonic deposition, having your local counsel conduct same with you in
> attendance via telephone, having you conduct same over the telephone with local counsel
> in attendance, or perhaps some other method which you can think of to save you time and
> expense.[109]

Therefore, contrary to Convertino's assertions, Ashenfelter and his counsel have not sacrificed civility and

their duties of good faith for the sake of their vigorous defense against Convertino's legal claims.

## IV.   CONCLUSION

For all of the foregoing reasons, Convertino's motions for contempt and sanctions should be denied.

---

[107] *Id.*

[108]  D/E 32 Ex H.

[109] Ex O.

Date: January 21, 2009       By:    /s/ Richard E. Zuckerman
                                   Herschel P. Fink
                                   Richard E. Zuckerman
                                   Brian D. Wassom
                                   HONIGMAN MILLER SCHWARTZ AND COHN LLP
                                   2290 First National Building
                                   Detroit, MI 48226
                                   (313) 465-7400
                                   hfink@honigman.com
                                   rzuckerman@honigman.com
                                   bwassom@honigman.com
                                   Attorneys for Non-Party David Ashenfelter

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2009, I electronically filed the foregoing paper(s) with the Clerk of the Court using the ECF system, which shall send a notice to all counsel of record.

/s/ Richard E. Zuckerman

DETROIT.3467508.4

32