





**salon.com**

Search [Go!] ● Salon ○ The Web   powered by YAHOO! SEARCH

Thursday, Oct 16, 2008    A&E   Books   Comics   Environment & Science   Life   Movies   News & Politics   Open Salon   Opir

# Glenn Greenwald

Glenn Gree
Sa

More

Su

SATURDAY FEB. 2, 2008 07:30 EST

## Is Michael Mukasey prioritizing the harassment and imprisonment of journalists?

**(updated below)**

Ever since the President's illegal warrantless eavesdropping program was revealed by the *New York Times'* Jim Risen and Eric Lichtblau back in December, 2005, there has been a faction of neoconservatives and other extremists on the Right calling for the *NYT* reporters and editors to be criminally prosecuted -- led by the likes of Bill Kristol (now of the *NYT*), Bill Bennett (of CNN), *Commentary* Magazine and many others. In May, 2006, Alberto Gonzales went on ABC News and revealed that the DOJ had commenced a criminal investigation into the leak, and then "raised the possibility [] that New York Times journalists could be prosecuted for publishing classified information."

That was one of the more revealing steps ever taken by Bush's DOJ under Gonzales: the administration violated multiple federal laws for years in spying on Americans, blocked all efforts to investigate what they did or subject it to the rule of law, but then decided that the only real criminals were those who alerted the nation to their lawbreaking -- whistleblowers and journalists alike. Even Gonzales' public musing about criminal prosecutions could have had a devastating effect -- if you're a whistleblower or journalist who uncovers secret government lawbreaking, you're obviously going to think twice (at least) before bringing it to light, given the public threats by the Attorney General to criminally prosecute those who do.

Eighteen months have passed since Gonzales' threats, and while there have been some signs that the investigation continues -- former DOJ official Jack Goldsmith, for instance, described how he was accosted and handed a Subpoena by FBI agents in the middle of Harvard



**Glenn Greenwald's Unclaimed Territory**

I was previously a constitutional law and civil rights litigator in New York. I am the author of two New York Times Bestselling books: "How Would a Patriot Act?" (May, 2006), a critique of the Bush administration's use of executive power, and "A Tragic Legacy" (June,

**Recent Post**
Patrick Ruffi
Democratic a
Destruction of
good, but it is
achieve anyth

**Steve Pearls**
Hank Paulson
The Washingt
led the world i
is actually the

**The Goldber**
likely Obama
Last week, se
the Dow was |
an Obama win

**"Great Amer**
The GOP has (
elections -- tri
smears -- and
ever

**Rick Davis: T**
McCain's camp
found "no viol
rules." Alas
violating" Alas

**Bill Kristol In**
Last week, the
campaign to a
rising, today h
and "pathetic"



Order from Amazon

Order from Barnes & Noble

Order from Powell's

**"How Would a Patriot Act?"**
(2006)



RSS feed

**Blogs I Read**

Andrew Sullivan
Anonymous Liberal
Balloon Juice
Blog of Rights (ACLU)
Blue Texan
Chris Floyd
Crooks & Liars
Daily Howler
Daily Kos
Digby
Eschaton
Eunomia
Fire Dog Lake
High Clearing
Hit and Run
Inside-Out the Beltway

Michael Mukasey has apparently decided to make criminal investigations of such leaks one of his top priorities, and is prepared for a massive First Amendment fight with Risen and his publisher, Simon & Schuster, which likely will include a willingness to imprison Risen if he fails to comply -- just as the Neoconservative Right, still seething over Risen's role in exposing the President's NSA lawbreaking, has been demanding for some time.

One of the leading theorists of the *"Imprison-the-NYT"* movement has been Gabriel Schoenfeld of Norm Podhoretz's *Commentary Magazine*. He wrote a widely-cited article back in March, 2006 arguing that Risen, Lichtblau and even *NYT* Editor Bill Keller should all be criminally prosecuted under the Espionage Act and other statutes for publishing the NSA story:

> *The real question that an intrepid prosecutor in the Justice Department should be asking is whether, in the aftermath of September 11, we as a nation can afford to permit the reporters and editors of a great newspaper to become the unelected authority that determines for all of us what is a legitimate secret and what is not. Like the Constitution itself, the First Amendment's protections of freedom of the press are not a suicide pact. The laws governing what the Times has done are perfectly clear; will they be enforced?*

On his *Commentary* blog yesterday, Schoenfeld gloated about the Subpoena to Risen and suggested a possible connection to not only Risen's work on the NSA story, but also Schoenfeld's own agitating for the imprisonment of these journalists. Schoenfeld wrote (referring to himself in the third person by the name of his blog, "Connecting the Dots"):

> *Finally, action. A federal prosecutor has issued a subpoena to James Risen of the New York Times, one of two reporters at the paper who compromised the National Security Agency's (NSA) Terrorist Surveillance Program in December 1995 (sic). . . .*
>
> *Why is this investigation proceeding now? Connecting the Dots has no inside information. But Connecting the Dots was seated at the same table as Michael Mukasey and his wife at two dinners in the last three years, back when the future Attorney General was still a mere federal judge. The leaks in the New York Times did not come up for discussion, but Mukasey made plain he was a close reader of COMMENTARY.*
>
> *Did he read a certain article in COMMENTARY entitled*

email addr







**MEET THE
ICONOCLASTS
NOW**

**THURSDAYS
10PM**

**sundance**
CHANNEL.

*So, let me see if I get this straight. The Congress issues
subpoenas to former [and current] Bush officials to
testify about administration conduct. Said officials
ignore the subpoenas. Nothing happens.*

*Administration, via grand jury, issues subpoena, Risen
is threatened with jail.*

*What's wrong with this picture?*

That's rather accurate.

One other notable aspect of this is that every time the administration
attacks press freedoms, the newspapers' Editorial Pages are virtually
mute. The only commentary I could find concerning the Risen
Subpoena is this appropriately concise reaction from Spencer
Ackerman, writing at the new online newspaper, *Washington
Independent*. Neither the *Post* nor the *Times'* Editorial Pages has
bothered to weigh in.

*— Glenn Greenwald*
**Permalink**

Share  ¦ Print

**Read comments (244)**

### Currently in Glenn Greenwald's Blog

**Salon Radio: Scott Horton**
Did PBS (and Jay Rockefeller's wife) block the broadcast of a
documentary linking torture to the Bush administration? And what
role did Bill Kristol play in Sarah Palin's selection?
Thursday, Oct 16, 2008 01:29 EDT

**Patrick Ruffini, the demise of the right and the Democratic
alternative**
Destruction of the right will achieve a necessary good, but it is only the
first step, not the last, to achieve anything meaningful.
Wednesday, Oct 15, 2008 15:24 EDT

**Steve Pearlstein's strange attempt to glorify Hank Paulson
and himself**
The Washington Post columnist claims that the U.S. led the world to
economic salvation when the truth is actually the exact opposite.
Tuesday, Oct 14, 2008 18:31 EDT

**The Goldberg Theorem: Dow skyrockets due to likely Obama
victory**
Last week, several right-wing geniuses claimed that the Dow was
plummeting due to investor fears of an Obama win.
Monday, Oct 13, 2008 23:33 EDT

**The New York Times**
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

April 30, 2006

# In Leak Cases, New Pressure on Journalists

### By ADAM LIPTAK

Earlier administrations have fired and prosecuted government officials who provided classified information to the press. They have also tried to force reporters to identify their sources.

But the Bush administration is exploring a more radical measure to protect information it says is vital to national security: the criminal prosecution of reporters under the espionage laws.

Such an approach would signal a thorough revision of the informal rules of engagement that have governed the relationship between the press and the government for many decades. Leaking in Washington is commonplace and typically entails tolerable risks for government officials and, at worst, the possibility of subpoenas to journalists seeking the identities of sources.

But the Bush administration is putting pressure on the press as never before, and it is operating in a judicial climate that seems increasingly receptive to constraints on journalists.

In the last year alone, a reporter for The New York Times was jailed for refusing to testify about a confidential source; her source, a White House aide, was prosecuted on charges that he lied about his contacts with reporters; a C.I.A. analyst was dismissed for unauthorized contacts with reporters; and a raft of subpoenas to reporters were largely upheld by the courts.

It is not easy to gauge whether the administration will move beyond these efforts to criminal prosecutions of reporters. In public statements and court papers, administration officials have said the law allows such prosecutions and that they will use their prosecutorial discretion in this area judiciously. But there is no indication that a decision to begin such a prosecution has been made. A Justice Department spokeswoman, Tasia Scolinos, declined to comment on Friday.

Because such prosecutions of reporters are unknown, they are widely thought inconceivable. But legal experts say that existing laws may well allow holding the press to account criminally. Should the administration pursue the matter, these experts say, it could gain a tool that would thoroughly alter the balance of power between the government and the press.

The administration and its allies say that all avenues must be explored to ensure that vital national

security information does not fall into the hands of the nation's enemies.

In February, Senator John Cornyn, Republican of Texas, asked Attorney General Alberto R. Gonzales whether the government's investigation into The Times's disclosure of a National Security Agency eavesdropping program included "any potential violation for publishing that information."

Mr. Gonzales responded: "Obviously, our prosecutors are going to look to see all the laws that have been violated. And if the evidence is there, they're going to prosecute those violations."

Recent articles in conservative opinion magazines have been even more forceful.

"The press can and should be held to account for publishing military secrets in wartime," Gabriel Schoenfeld wrote in Commentary magazine last month.

## Surprising Move by F.B.I.

One example of the administration's new approach is the F.B.I.'s recent effort to reclaim classified documents in the files of the late columnist Jack Anderson, a move that legal experts say was surprising if not unheard of.

"Under the law," Bill Carter, a spokesman for the Federal Bureau of Investigation, said earlier this month, "no private person may possess classified documents that were illegally provided to them."

Critics of the administration position say that altering the conventional understanding between the press and government could have dire consequences.

"Once you make the press the defendant rather than the leaker," said David Rudenstine, the dean of the Benjamin N. Cardozo School of Law in New York and a First Amendment scholar, "you really shut down the flow of information because the government will always know who the defendant is."

The administration's position draws support from an unlikely source — the 1971 Supreme Court decision that refused to block publication by The Times and The Washington Post of the classified history of the Vietnam War known as the Pentagon Papers. The case is generally considered a triumph for the press. But two of the justices in the 6-to-3 majority indicated that there was a basis for after-the-fact prosecution of the newspapers that published the papers under the espionage laws.

## Reading of Espionage Laws

Both critics and allies of the administration say that the espionage laws on their face may well be read to forbid possession and publication of classified information by the press. Two provisions are at the heart of

the recent debates.

The first, enacted in 1917, is, according to a 2002 report by Susan Buckley, a lawyer who often represents news organizations, "at first blush, pretty much one of the scariest statutes around."

It prohibits anyone with unauthorized access to documents or information concerning the national defense from telling others. The wording of the law is loose, but it seems to contain a further requirement for spoken information. Repeating such information is only a crime, it seems, if the person doing it "has reason to believe" it could be used "to the injury of the United States or to the advantage of any foreign nation." That condition does not seem to apply to information from documents.

In the Pentagon Papers case, Justice Byron R. White, joined by Justice Potter Stewart, said "it seems undeniable that a newspaper" can be "vulnerable to prosecution" under the 1917 law.

Indeed, the Nixon administration considered prosecuting The Times even after the government lost the Pentagon Papers case, according to a 1975 memoir by Whitney North Seymour Jr., who was the United States attorney in Manhattan in the early 1970's. Mr. Seymour wrote that Richard G. Kleindienst, a deputy attorney general, suggested convening a grand jury in New York to that end. Mr. Seymour said he refused.

Some experts believe he would not have won. The most authoritative analysis of the 1917 law, by Harold Edgar and Benno C. Schmidt Jr. in the Columbia Law Review in 1973, concluded, based largely on the law's legislative history, that it was not meant to apply to newspapers.

A second law is less ambiguous. Enacted in 1950, it prohibits publication of government codes and other "communications intelligence activities." Andrew C. McCarthy, a former federal prosecutor who took part in terrorism investigations in New York after the Sept. 11 attacks, said that both The Times, for its disclosures about the eavesdropping program, and The Post, for an article about secret C.I.A. prisons, had violated the 1917 law. The Times, he added, has also violated the 1950 law.

"It was irresponsible to publish these things," Mr. McCarthy said. "I wouldn't hesitate to prosecute."

The reporters who wrote the two articles recently won Pulitzer Prizes.

Even legal scholars who are sympathetic to the newspapers say the legal questions are not straightforward.

"They are making threats that they may be able to carry out technically, legally," Geoffrey R. Stone, a law professor at the University of Chicago and the author of "Perilous Times: Free Speech in Wartime," said of the administration. The law, Professor Stone added, "has always been understood to be about spying, not about newspapers, but read literally it could be applied to both."

Others say the law is unconstitutional as applied to the press under the First Amendment.

"I don't think that anyone believes that statute is constitutional," said James C. Goodale, who was the general counsel of The New York Times Company during the Pentagon Papers litigation. "Literally read, the statute must be violated countless times every year."

Rodney A. Smolla, the dean of the University of Richmond law school, took a middle ground. He said the existing laws were ambiguous but that in theory it could be constitutional to make receiving classified information a crime. However, he continued, the First Amendment may protect newspapers exposing wrongdoing by the government.

The two newspapers contend that their reporting did bring to light important information about potential government misconduct. Representatives of the papers said they had not been contacted by government investigators in connection with the two articles.

That is baffling, Mr. McCarthy said. At a minimum, he said, the reporters involved should be threatened with prosecution in an effort to learn their sources.

"If you think this is a serious offense and you really think national security has been damaged, and I do," he said, "you don't wait five or six months to ask the person who obviously knows the answer."

## Case Against 2 Lobbyists

Curiously, perhaps the most threatening pending case for journalist is one brought against two former lobbyists for the American Israel Public Affairs Committee, or Aipac. The lobbyists, Steven J. Rosen and Keith Weissman, were indicted in August on charges of violating the 1917 law by receiving and repeating national defense information to foreign officials and reporters.

The lobbyists say the case against them is functionally identical to potential cases against reporters.

"You can't say, 'Well, this is constitutional as applied to lobbyists, but it wouldn't be constitutional if applied to journalists,' " Abbe D. Lowell, a lawyer for Mr. Rosen, said at a hearing in the case last month, according to a court transcript.

In court papers filed in January, prosecutors disagreed, saying lobbyist and journalist were different. But they would not rule out the possibility of also charging journalists under the law.

"Prosecution under the espionage laws of an actual member of the press for publishing classified information leaked to it by a government source would raise legitimate and serious issues and would not be undertaken lightly," the papers said. Indeed, they continued, "the fact that there has never been such a

prosecution speaks for itself."

Some First Amendment lawyers suspect that the case against the lobbyists is but a first step.

"From the point of view of the administration expanding its powers, the Aipac case is the perfect case," said Ronald K. L. Collins, a scholar at the First Amendment Center, a nonprofit educational group in Virginia. "It allows them to try to establish the precedent without going after the press."

Copyright 2006 The New York Times Company

Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for Us | Site Map

Publishing secret data prosecutable, Gonzales says                                                 Page 1 of 3

home of the

Home Delivery | Today's Paper | Ads

THE ALL-NEW
**FLEX** **24 MPG**
SEVEN-SEAT CROSSOVER

CH

[ SEARCH ]   SFGate   Web Search by YAHOO!  | Advanced Search

Bay Area & State   Nation   World   Politics   Crime   Tech   Obituaries   Education   Environment   Science   Health   Weird   Opi

## Publishing secret data prosecutable, Gonzales says

Adam Liptak, New York Times
Monday, May 22, 2006

PRINT   E-MAIL   SHARE   COMMENTS (0)      FONT | SIZE: - +      

THE ALL-NE
FLE

24 MPG
SEVEN-SEAT C
▶ WATCH


The government has the legal authority to prosecute journalists for publishing classified information, Attorney General Alberto Gonzales said Sunday.

**MORE NEWS**

Officials: FBI investigates ACORN for voter fraud 10.16.08

Stocks fluctuate as market tries to assess economy 10.16.08

Motorcyclist killed in crash near S.F. State 10.16.08

"There are some statutes on the book which, if you read the language carefully, would seem to indicate that that is a possibility," Gonzales said on the ABC News program "This Week."

"That's a policy judgment by the Congress in passing that kind of legislation," he said. "We have an obligation to enforce those laws. We have an obligation to ensure that our national security is protected."

MOST-COMM

1.  Conserv
2.  Obama debate
3.  The final
4.  Palin's p
5.  Cheney heartbea
6.  Some bc law
7.  More bc you dow

He was referring to the 1917 Espionage Act, which made it a crime for an unauthorized person to receive national defense information and to transmit it to others.

Asked whether he was open to the possibility that the New York Times should be prosecuted for its disclosures in December concerning a National Security Agency surveillance program, Gonzales said his department was trying to determine "the appropriate course of action in that particular case."

Under the same statute, the Justice Department is prosecuting two former lobbyists for the American Israel Public Affairs Committee for receiving and transmitting classified information that they received from a Defense Department official, who recently pleaded guilty and was sentenced to 12 years in prison.

U.S. District Judge T.S. Ellis III, who is presiding over the AIPAC case, is weighing a

**TopHor**

From
McGuire
Estat

**RICHMOND**
3 BR / 3 BA
$1,125,000

**CENTRAL
WATERFRON**
1 BR / 1.5 BA
$635,420

**CENTRAL**

2:07-cv-13842-RHC-RSW   Doc # 44-7   Filed 01/21/09   Pg 10 of 35   Pg ID 898
Publishing secret data prosecutable, Gonzales says

Page 2 of 3

motion to dismiss the charges based on the defendants' claim that the 89-year-old espionage statute is unconstitutionally vague and might violate the First Amendment.

Gonzales said that the administration promoted and respected the right of the press that is protected under the First Amendment.

"But it can't be the case that that right trumps over the right that Americans would like to see, the ability of the federal government to go after criminal activity," he said. "And so those two principles have to be accommodated."

*Chronicle news services contributed to this report.*

*This article appeared on page **A - 2** of the San Francisco Chronicle*

📄 PRINT    ✉ E-MAIL    ⇄ SHARE

**(0)   View Comments »**

**Be the first to share your thoughts on this story.**

**Add Your Comment**
You must be signed in to add a comment. Sign In | Register



[Submit]

---





**Anti-Porn Skies**
Violet Blue wants to know, if airline Wi-Fi is censored, who wants it?



**You Don't Know Joe**
Plumber is a central figure in the prez debate. Who is he?



**Afghanistan According To Palin**
Ya know, people forget what's going on there. Mark Fiore.

••• 

Ads by Yahoo!

**Online Degrees**
Get Your AA, BA, Masters or PhD at a Top Online School. Start Now.
(www.NexTag.com)

**Car Insurance Quotes Online**
Compare auto insurance quotes from top companies online.
(www.Insurance.com)

**See Today's Mortgage Rates**
Calculate Your New Mortgage Payment. See Rates- No Credit Check Req.
(www.LowerMyBills.com)

**WATERFRONT**
1 BR / 1.5 BA
$626,240

**CENTRAL WATERFRONT**
2 BR / 2 BA
$981,252

**CENTRAL WATERFRONT**
2 BR / 2 BA
$991,830

**CENTRAL WATERFRONT**
2 BR / 2.5 BA
$1,165,289

**CENTRAL WATERFRONT**
2 BR / 2.5 BA
$1,274,238

**CENTRAL WATERFRONT**
2 BR / 2.5 BA
$1,284,056

**RUSSIAN HILL**
2 BR / 1.5 BA
$1,495,000

**MISSION BAY**
2 BR / 2 BA
$699,000

See more from broker



About Top Hom

**HOMES**



PUC should Lohan And Big homeow

**CARS**





http://writ.news.findlaw.com/commentary/20060609_klarevas.html

[FILE /includes/writ/writ.news.findlaw.com/includes/breadcrumb.shtml NOT FOUND]



Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information?
Interpreting the Espionage Act

**By LOUIS KLAREVAS**

Friday, Jun. 09, 2006

Journalists, beware. If you publish leaked classified information, you might be prosecuted.

That was the message Attorney General Alberto Gonzales recently sent in an interview with ABC News. Gonzales said that, while he understood the importance of the First Amendment right to freedom of the press, "it can't be the case that that right trumps over ... the ability of the federal government to go after criminal activity."



Let us wear the technology one.

It seems that Gonzales makes no exception for classified information that is of intense public interest - such as the existence of a secret CIA global prison network, or a secret domestic wiretapping program.

The Attorney General's threats should not be taken lightly. The Department of Justice is actively investigating the leaking of classified material to reporters.

As I have discussed in a previous _Writ_ column, the Bush Administration has already indicted government officials who've leaked classified information, and those outside of government receiving it. To date, it has not gone after reporters, but that seems likely to change.

### Does the Espionage Act Grant Authority to Prosecute Journalists for Receiving Classified Information?

As Gonzales told George Stephanopoulos during the May 21 episode of _This Week_, "There are some statutes on the book which, if you read the language carefully, would seem to indicate that [the prosecution of reporters for publishing classified information] is a possibility. That's a policy judgment by the Congress in passing that kind of legislation. We have an obligation to enforce those laws. We have an obligation to ensure that our national security is protected."

Gonzales is apparently referring to provisions of the Espionage Act of 1917. Under 18 U.S.C. § 793(e), it is a crime to "willfully communicate" any "information relating to the national defense which . . . the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation . . . to any person not entitled to receive it." Moreover, when two or more persons cooperate to violate section 793(e), that constitutes conspiracy under 18 U.S.C. § 793(g). Additionally, under 18 U.S.C. § 798(a)(3), "whoever knowingly and willfully . . . publishes . . . any classified information . . . concerning the communication intelligence activities of the United States or any foreign government" is subject to up to ten years of imprisonment.

The Espionage Act was intended primarily to punish government employees and contractors who passed classified information to agents of foreign governments. Indeed, the most famous prosecution under the Act was of Ethel and Julius Rosenberg, who were charged with treason and ultimately executed.

Yet, as Matthew Friedrich, the chief of staff of the Justice Department's Criminal Division, told the Senate Judiciary Committee earlier this week, the relevant sections of the Espionage Act "do not exempt any class of professionals, including reporters, from their reach."

Sen. Arlen Specter (R-PA), the chairman of the Judiciary Committee, saw Friedrich's assertions that the Espionage Act seemed to apply broadly as "an invitation to the Congress to legislate on the subject." Friedrich, however, cautioned against any amendments of the Espionage Act to restrict the prosecution of reporters, reiterating the Department of Justice position that "legislation in creating a media shield was not needed, that it would slow down the effective administration of justice."

As the exchange between Friedrich and Specter displays, the two political branches of government do not necessarily subscribe to the same construction of the Espionage Act. Federal case law, therefore, remains the best guidance on the issue.

### The Judicial Decision Rejecting a First Amendment Espionage Act Exception

In the mid-1980s, the Espionage Act was successfully used to prosecute a leak of classified material to the news media. The prosecution, however, targeted the leaker, not the journalist.

In its 1988 decision in *United States v. Morison*, the U.S. Court of Appeals for the Fourth Circuit upheld the Espionage Act conviction of former U.S. Navy analyst Samuel Morison, who had mailed secret satellite photos to *Jane's Defence Weekly*, a popular British military affairs magazine.

The Fourth Circuit rejected Morison's claim that the First Amendment "offers asylum . . . merely because the transmittal was to a representative of the press." The court reasoned that the "First Amendment, in the interest of securing news or otherwise, does not 'confer a license on either the reporter or his news source to violate valid criminal laws.'"

In a concurring opinion, Judge Wilkinson pointed out that "the Court has held that government restrictions that would otherwise be impermissible may be sustained where national security and foreign policy are implicated," recognizing "'a compelling interest in protecting . . . the secrecy of information important to our national security." He also opined that an opposite result would have amounted to "a judicial declaration that the government may never use criminal penalties to secure the confidentiality of intelligence information."

### Supreme Court Dicta Suggests Journalists Could Face Espionage Act Prosecutions

The Supreme Court has not ruled on the constitutionality of prosecuting those who leak to the press under the Espionage Act. Moreover, no court has yet ruled on whether prosecuting journalists for relaying classified information to the public can come under the Act.

Nevertheless, Gonzales can find strong support for his position in the Supreme Court's 1971 opinion in *New York Times v. United States*. There, the government asked for an injunction against the *New York Times* and the *Washington Post* to prevent them from publishing classified excerpts of the Pentagon Papers.

The Court refused the injunction, but in dicta - that is, language not integral to the case's resolution - several justices suggested that after publication, the government could bring criminal charges against the newspapers under the Espionage Act.

In his concurrence (joined by Justice Potter Stewart), Justice Byron White went even further. Having reviewed the legislative history behind the Espionage Act, he stated that "Congress appeared to have little doubt that newspapers would be subject to criminal prosecution if they insisted on publishing information of the type Congress had itself determined should not be revealed." He warned that he "would have no difficulty in sustaining [such] convictions" under the Espionage Act. In addition, Chief Justice Warren Burger expressed his "general agreement" with "much of" what Justice White said in this respect.

Even the more liberal Justices Thurgood Marshall and Harry Blackmun were unwilling to expressly rule out Espionage Act prosecutions of journalists. Indeed, Blackmun emphasized that "First Amendment absolutism has never commanded a majority of this Court," and quoted Justice Oliver Wendell Holmes' view in the _Schenck_ case that "It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right."

### Will the Relevant Section of the Espionage Act Be Held to Violate the First Amendment?

Of course, the Pentagon Papers case was resolved in the midst of the Vietnam War. Now, thirty-five years, later, we face the "war on terrorism," a very different kind of "war" that raises different issues.

In addition, we have a completely new Supreme Court - one that shares not a single member with 1971's Court. (Its most longstanding member, Justice John Paul Stevens, joined the Court in 1975.)

Nevertheless, given the strong signals sent by the Court in 1971, it seems likely that federal trial and appellate courts would allow the prosecution of journalists for communicating classified information to go forward - until and unless the Supreme Court rules otherwise or the Congress intervenes and amends the Espionage Act to shield journalists.

The Bush Administration is doubtless aware of this - and knows that if it starts this battle, it will probably win - at least in the early rounds.

In light of this reality, journalists should realize that prosecutions are a real possibility if they do go forward in publishing leaked classified information.

_Louis Klarevas teaches in the graduate Global Affairs program at New York University's School of Continuing and Professional Studies. He can be reached at ljk3@nyu.edu._

[FILE /includes/writ/writ.news.findlaw.com/includes/right.shtml NOT FOUND]

Company | Privacy Policy | Disclaimer          Copyright © 1994-2008 FindLaw

# washingtonpost.com

# Prosecution of Journalists Is Possible in NSA Leaks

Advertisement

VISIT THE OFFICIAL
**BARACK OBAMA**
WEBSITE NOW

JOIN US

PAID FOR BY OBAMA FOR AMERICA

By Walter Pincus
Washington Post Staff Writer
Monday, May 22, 2006; A04

Attorney General Alberto R. Gonzales raised the possibility yesterday that New York Times journalists could be prosecuted for publishing classified information based on the outcome of the criminal investigation underway into leaks to the Times of data about the National Security Agency's surveillance of terrorist-related calls between the United States and abroad.

"We are engaged now in an investigation about what would be the appropriate course of action in that particular case, so I'm not going to talk about it specifically," he said on ABC's "This Week."

In December, the Times broke a story about the secret program.

On the talk show, when asked if journalists could be prosecuted for publishing classified information, Gonzales responded, "There are some statutes on the book which, if you read the language carefully, would seem to indicate that that is a possibility."

He was referring to the 1917 Espionage Act, which made it a crime for an unauthorized person to receive national defense information and transmit it to others.

Under that act, the Justice Department is prosecuting two former lobbyists for the American Israel Public Affairs Committee for receiving and transmitting classified information they received from a Defense Department official, who recently pleaded guilty and was sentenced to 12 years in prison. U.S. District Judge T.S. Ellis III, who is presiding over the AIPAC case, is weighing a motion to dismiss the charges based on the defendants' claim that the 89-year-old espionage statute is unconstitutionally vague and might violate the First Amendment.

Yesterday, Gonzales said, "I understand very much the role that the press plays in our society, the protection under the First Amendment we want to promote and respect . . . but it can't be the case that that right trumps over the right that Americans would like to see, the ability of the federal government to go after criminal activity."

As for the Times, he said, "As we do in every case, it's a case-by-case evaluation about what the evidence shows us, our interpretation of the law. We have an obligation to enforce the law and to prosecute those who engage in criminal activity."

© 2006 The Washington Post Company

Ads by Google

**Michigan Board of Regents**
Re-Elect Larry Deitch To The Board & Help Shape U of M's Future!
www.LarryDeitchForRegent.com

| | SEARCH BLOG | ▪FLAG BLOG Next Blog» | Create Blog \| Sign In |
|---|---|---|---|

# Just Observing

## About Me
**NAME:** WATCH 'N WAIT   **LOCATION:** SAN DIEGO, CALIFORNIA, UNITED STATES
other blog URL: http://migf.blogspot.com
**View my complete profile**

*Recent posts*

**Air America 1360 bumper sticker got her fired!!!!**

**China gives BushCo hell about Human Rights...**

**Gitmo...most tortured prisoners NOT al Queda...**

**Bush, with line item veto, would keep torture...**

**Progressive Dems ....**

**Clinton a hell of a lot better against terror than...**

**Molly Ivins has had it and says so...**

**Here's a list of good books coming....**

**Gawd! If only....**

**DeLay & BushCo...Fundies & Congress bend over...**

Top 10 most recommended posts from the Indy Weblogs
• **Republican Zombie Lies Debunked - Part I** - from **Main St. USA**
3 recommendations

THURSDAY, MARCH 09, 2006

### DOJ: Prosecute reporters...

From the Sacramento Bee:

Editorial: Your eyes only
Administration tries to plug leaks
Published 2:15 am PST Thursday, March 9, 2006
Story appeared in Editorials section, Page B8

Ironies abound in how the Bush administration handles classified information. It has set an all-time record for classifying information, yet has been willing to leak classified information to serve its own purposes. But when opponents within the administration do the same, the administration cries foul.

Now, it has gone too far. A Bush Justice Department court filing asserts a novel theory that private citizens and journalists can be prosecuted under the 1917 Espionage Act simply for receiving and publishing classified information.

This sweeping claim comes in a case brought by the Justice Department against two lobbyists. In conversation, then-Pentagon official Lawrence A. Franklin leaked a controversial proposal by Pentagon neoconservatives to destabilize Iran. Private citizens Steven J. Rosen, director of foreign policy issues for the American-Israel Political Action Committee, and Keith Weissman, its senior Middle East analyst, repeated what they heard to Israeli diplomats, Washington think tank analysts and journalists.

The old view of the espionage law was that it was a crime for a government official who has responsibility for protecting classified information to leak it. In this case, Franklin pleaded guilty. He had a security clearance and had signed an agreement not to transmit classified information to outsiders. He broke the law.

But the Bush administration goes on to assert that people who listen to

[Recommend This
Post]

• The Wasilla
Project: #1 - from
Main St. USA
3 recommendations
[Recommend This
Post]

• Welcome to the
Big Leagues, Sarah
Palin - from Main
St. USA
3 recommendations
[Recommend This
Post]

• ACORN Does
More to Elect
Obama Than
Anyone; Obama
Shuns ACORN in
Obedience to
Media - from
Democrats.com
2 recommendations
[Recommend This
Post]

• Headlying of the
day - from Steve
Audio
2 recommendations
[Recommend This
Post]

• Quote of the Day -
from Tom's
Irrelevant Musings
2 recommendations
[Recommend This
Post]

• McCain Tangled
in His Own Web -
from Main St. USA
2 recommendations
[Recommend This
Post]

• McCain Airquotes
Around "Health of
the Mother" - from
Main St. USA
1 recommendation
[Recommend This
Post]

• What Just
Happened to Me? -
from Main St. USA
1 recommendation

what a government official has to say and pass it on also have committed
a crime - even though, as government outsiders, they may have no way of
knowing whether information is classified.

The reality, since the beginning of our republic, is that administration
officials often deliberately leak classified information to influence public
debate. In other cases, government officials see it as their patriotic duty
to expose certain information. They know they are breaking the law and
are willing to commit an act of civil disobedience. But private citizens
who receive the information have no obligation to preserve classified
information. Our laws recognize that, in some circumstances, the only
effective restraint on the president and Congress is an informed and
critical public.

The Justice Department brief admits in passing that prosecuting the
press under espionage laws for publishing classified information leaked
by a government source has never taken place. Let's keep it that way.

Wrap...

posted by Watch 'n Wait | 2:46 PM


0 Comments:

**Post a Comment**

<< Home

Detroit Public TV

| About FRONTLINE | Watch FRONTLINE Online | Schedule | Search [          ] ▶ | E-Mail This Page |

# N E W S W A R  FRONTLINE

○ HOME   ○ INTERVIEWS   ○ SITE MAP



 

○ DISCUSSION



Watch Online

# Prosecuting reporters/the Espionage Act



Former director of public affairs, Justice Department

**+ Read the full interview >**

## Mark Corallo

**Attorney General Gonzales has now hinted that maybe journalists should be prosecuted under the Espionage Act. ... [Did] that come up when you were in the Justice Department?**

I never heard that before. However, I'm never going to foreclose any option that the government has, because you wouldn't want a reporter to be able to hide behind that so-called First Amendment shield and actually be a foreign agent.

However, I think that this is where we've all got to take a deep breath. From the attorney general on down at the Justice Department, and from the editor of *The New York Times* on down in the media, everybody needs to take a deep breath

**Mark Corallo**
Former director of public affairs, Justice Department

**James Goodale**
First Amendment attorney

**Seymour Hersh**
Writer, *The New Yorker*

**John Hinderaker**
Blogger, Power Line

**Eric Lichtblau**
Reporter, *The New York Times*

**Walter Pincus**
Reporter, *The Washington Post*

**Brian Ross**
Chief investigative correspondent, ABC News

**Bill Sammon**
Reporter, *The Washington Examiner*



and step back and think about their roles, and think about what's good for America. I don't think it's good to be clapping journalists in jail. I also don't think it's good for newspapers to be deciding what national security secrets should be kept secret and what shouldn't. So there's got to be some balance.

**David Szady**
Former assistant director of counter-intelligence, FBI



**First Amendment attorney**

**+ Read the full interview >**

## James Goodale

**We have the AIPAC [American Israel Public Affairs Committee] case and the application of the Espionage Act in the AIPAC case. Is that a bad precedent for the press? ...**

... This case is very unique. It troubles me for many points. First of all, ... the Bush administration is trying to stop leaks in a way that has not been done before as far as I know. ... The Bush administration is taking the position that what we have now in this country, as far as they're concerned, is an Official Secrets Act, whereby they can penalize any leak of classified information. That has not been what has happened in this country for 50 years. We've had leaks of classified information forever and ever. There are reporters who live on leaked information, who could not survive without leaked information. Now what the Bush administration is saying is, "We're going to stop all leaks, and we're going to punish them under the Espionage Act." ...

**Do you think the Espionage Act is constitutional?**

The Espionage Act applies to espionage. ... Isn't it strange we've got an act called the Espionage Act? What does that mean? That means ... I gave you this classified document; you're working for the Nazis; that's espionage. That's what that act was written about. It was not written about publication.

In fact, when the act was brought up on the Congress floor, somebody said it ought to apply to publication. And Sen. [Henry Fountain] Ashurst [D-Ariz.] ... said, "No, under the First Amendment, you can't have it." They took it out. It was never meant to apply to publication. It was never meant to apply, in my humble opinion, even to leaking. It applies to -- guess what? -- espionage. ...

So this is the first time that this relic of a law, a 1917 law, had been used to apply to leakees -- namely, the lobbyists -- because they receive the information. If it can be applied to them as leakees, then the government has jumped over a hurdle, which people have always thought was there in the Espionage Act, to reach reporters as leakees. ... It's the Espionage Act, not the Leak Act. They've turned it into the Leak Act,

for leakees. ...

**Is there any precedent for this?**

I don't believe there's any precedent for this. ... The law has been sitting there for 90 years, and no one wanted to use it really. But the Bush administration really wants to use this old relic. ...

**Doesn't it make sense to protect our [classified intelligence] from people publishing information about it?**

Every issue relating to national security, there is a "makes sense" argument from the government's point of view. But the "makes sense" argument has to be consistent with the First Amendment. ...

**Has the [AIPAC case] been a victory for the Bush administration?**

The Bush administration, in my humble view, has waged a war against the press, and using the Espionage Act is part of its program to wage that war. ... The attorney general, Mr. [Alberto] Gonzales, said in an interview with network television that he was looking at the Espionage Act to use it against *The New York Times* and, indeed, against other newspapers. ... When he says there are laws on the books, well people who know know there are not many laws there other than the Espionage Act. So, he effectively is saying the Espionage Act can be used. ... Therefore, to have a decision that helps him take that move is very useful. ...

**We have never had an Official Secrets Act in this country. ... We don't have it because of the First Amendment. We also don't have it because Congress has never been able to pass it. The last time it was up for passage, President Clinton vetoed it, so I would like to assert that what the Bush administration is doing, knowing that they can't get the law through Congress, is going through the back door. ... They're taking an old act that's got loosey-goosey language, and they're ... getting the law passed in court.**

[Prosecution using the Espionage Act is] the first step in creating total executive control over our activities, ... a unitary executive who has total control over the information.

---

# Seymour Hersh

When you hear the attorney general [Alberto Gonzales] say -- and I don't think any attorney general has ever said it in public before -- that they could use the



**Writer,**
*The New
Yorker*

**+ Read
the full
interview
>**

**Espionage Act [to prosecute reporters], you don't think that's a change?**

I don't think they'd dare do it. Even [John] Ashcroft, at his worst days. I was told by a couple of people on Sept. 12, 2001, the day after 9/11, two different people called me, one from the military and one from a federal agency, saying these guys are going to ruin the Constitution. They'd gone to a meeting --"You can't believe...." Obviously he was talking about the wiretaps, the NSA stuff. And so I know.

But I say that underneath all of this bluster and talk and threats, anybody knows that if they make a serious move on the First Amendment, they do so at their political peril, because there's a real core in this country -- it may not be articulated very often, but there's a real core -- that if anybody ever really steps on our neck too hard, they're going to suffer; we won't. I do believe that.



**Blogger,
Power
Line**

**+ Read
the full
interview
>**

# John Hinderaker

The leaked story that most clearly violated the Espionage Act was the one relating to the NSA's international terrorist surveillance program, because there is a specific section of the U.S. criminal code -- section 793 -- that makes it a crime to disclose information about U.S. communications intelligence or information learned through communications intelligence. Section 793 applies squarely to that leak and the publication of that leak by *The New York Times.* There are some other stories where I think you can easily make the argument that it was a crime to leak the story, and arguably a crime to publish the story under section 798 of the criminal code. But there you have some broader language that would need to be interpreted and applied to the facts. ...

# Eric Lichtblau



Reporter,
*The New
York
Times*

+ Read
the full
interview
>

**You say there's no Official Secrets Act, but in fact there is. There's an Espionage Act, and it says public information and possessed information that's classified. It just hasn't been enforced.**

Yeah, an Espionage Act that certainly has never been used in that way to go after reporters before. There may be people in the government who would like to interpret the Espionage Act as our version of Britain's State Secrets Act, but it's certainly never been interpreted that way before.

**But they're threatening now. I think it's Rep. Peter King [R-N.Y.], who's the chairman of the House Homeland Security Committee, has said it publicly, right?**

Yeah. I think we've seen ... quite a pushback in the last week or so after our SWIFT banking story ran, with numerous leaders in the media field [and] national security experts saying, hang on a minute here, did the story really disclose anything that the terrorists were not already well aware of? There have now been a whole slew of stories making the point -- the same way that we debated internally for weeks and weeks -- that there is an almost limitless supply of information from 2001 through the point of our story about the fact that the government is aggressively tracking the finances of Al Qaeda, ... so much so, in fact, that Al Qaeda had started in 2001, 2002 to move money out of the traditional banks. The idea that our story ... gave the enemy some tangible information that they didn't know, I think people are starting now to realize that argument may ring a little hollow.



Reporter,
*The
Washington
Post*

+ Read
the full
interview
>

# Walter Pincus

... This administration, in the context of classification and secrecy -- in part because they've got this terrorism fear thing which they've been working up to and working the public on -- they've become much stronger about secrets. I think the step they've taken, which is to start employing the Espionage Act and the threat of the Espionage Act, puts them in a whole different category.

The Espionage Act was passed in 1917. It's got a provision in it that says that anybody who is not entitled to receive national defense information -- doesn't describe what that is -- ... who receives it and then transmits it to anybody, us, that's unauthorized.

**Or publish it?**

Well, publish, talks about it, anything -- is in violation of the act. What this administration has done is gone back to the famous Pentagon Papers case

and used the opinions of several [Supreme Court] judges, including Potter Stewart, who said prior restraint was wrong; stopping the *Times* or trying to stop the *Post* from publishing before they publish was wrong; [that] what the Nixon administration should have done is use the Espionage Act after they publish. This administration has resurrected that.

A friend of mine who worked in the Justice Department on these cases for years said there always was a gentleman's agreement it would never be used against the press. In fact, there is a debate going back to 1950, when it was renewed, that it wouldn't be used against the press.

This administration ... hasn't yet, but it is using it against two civilians, non-government people, who are lobbyists for a pro-Israeli group and have indicted them for violation of the Espionage Act. That case is pending. ...

**And as I understand it, in that motion, one of the former advocates for the Justice Department has filed an affidavit. Is that correct?**

Viet Dinh, who was [in] the Office of Legal Counsel in the Justice Department, [who] helped write the Patriot Act, has actually filed a very strong memorandum on behalf of the defendants saying, "This goes too far," and that the act is too vague and it should be held unconstitutional.

**We interviewed [former Justice Department Director of Public Affairs] Mark Corallo the other day. ... He said, "Somebody was asleep at the switch at the Justice Department." He doesn't understand why they did this. He's at a loss.**

What I'm surprised he doesn't know is that the indictment in the AIPAC case, the American Israel Public Affairs Committee, the indictment in that case was brought by Paul McNulty, who is the deputy attorney general today. And there is a representative of the attorney general who's part of the trial team for the prosecution.

This is a case that they know full well all about and are pursuing it and have made clear in their filings, and the judge has made in his opinions, that this could very easily not just apply to civilian lobbyists, but apply to journalists, apply to think tank people, apply to any kind of academic doing research in the world of national security. ...

One of the counts against these lobbyists is that they received, orally, classified information. Well, the whole question is, how are you going to tell when somebody tells you something that it's classified? If it's a classified document, it's got classification on it. Previous cases had that. But in this case, the first oral case, first case with civilians, how is the recipient supposed to know it's classified, other than the fact they were told by the Pentagon official who told them the information that this is classified?

**Sounds like it might put a crimp in your style if this becomes the law.**

Well, some people feel that way. I have a different view of things. Most of the times

that I have confidential sources or get classified information, it's from people that I've known a long time who trust me and I trust them. ...

**But what I hear you saying is that the AIPAC case -- with the Espionage Act as the reason for it -- would make it illegal for you to meet with your old friends, the people you're talking about, that were acquaintances or the people who trust you, and take possession of the information.**

And print it, too, yeah.

**Right. That's not going to affect how you do business?**

No. (Laughs.) We've been doing this for years, and you just keep doing it. I've been involved in this for years. I was subpoenaed in the Valerie Plame case and Wen Ho Lee case, and I haven't lost sources. Sources still talk to me, and I still protect them. That's a part of the business.

---



Chief
investigative
correspondent,
ABC News

+ Read
the full
interview
>

# Brian Ross

**Congressman ]Peter] King [R-N.Y.], [state] Sen. [Jake] Corman [R-Pa.] and the attorney general of the United States [Alberto Gonzales] think it's even more serious, that people should be prosecuted for espionage. Just a bunch of smoke?**

Well, they are politicians, and I think that doesn't solve the problem. It's foolish talk, frankly.

**Other societies, you can't report this kind of material, period, right?**

We're different. We have a First Amendment. It's one of the strengths of this country.

**The reply is the Constitution is not a suicide pact.**

And no one says it is. There's no story we would do here that would put in danger lives. When we've done stories, the argument was, well, you make it impossible, if you reveal this, for the CIA ever to make any more secret deals.

**Well?**

Well, it's not my job to protect the clandestine operations of the CIA when they make deals that would violate the country's own laws when they're making the deals.

Foreign intelligence operations and law enforcement agencies are sometimes reluctant to tell U.S. agencies what they know because it may be revealed, get leaked. So it does affect the CIA's ability, for instance, to share information.

The CIA objected to our story about the secret prisons they're operating in Europe, and their position was, essentially, "How are we ever going to be able to make any more secret-prison deals if you do this story?" Didn't put any lives at stake. It really didn't. ...

## Bill Sammon



Reporter,
*The
Washington
Examiner*

+ Read
the full
interview
>

[With the subsequent story being published on this program concerning the monitoring of financial transactions of terrorists, there have been calls to look into charging *The New York Times* with violating the Espionage Act. What's your take on that?]

... In the end, from a political perspective, there's limited utility in really making a federal case against the media where you're trying to prosecute them and take them into court and everything like that. The old saying, you never want to pick a fight with a guy who buys his ink by the barrel. You're basically allowing *The New York Times* and the mainstream media to become martyrs and victims of the overreaching, evil Bush administration, Big Brother. I don't think it would necessarily serve the president's interest to do that.

It's probably appropriate for the president to rail against *The New York Times*, for Republicans to rail against *The New York Times* when they make these disclosures, but when it comes to actually hauling them into court and prosecuting them, I think the Republicans would risk overreaching and would risk a backlash. ...

## David Szady

The Espionage Act -- you investigate under that statute as well, right, when there's a leak?

Yes.

Is the Espionage Act your main legal jurisdiction?

Yes.

How does the Espionage Act apply to reporters?



**Former assistant director of counter-intelligence, FBI**

+ Read the full interview >

Well, remember now, the reporter is not the subject of the investigation; the reporter is the individual who received the information. ...

You could look at it this way. Reporters are in the intelligence-gathering business. They're gathering intelligence. It's an intelligence operation. Unfortunately, in these cases when the FBI's involved, it's classified information. Now, when that information is taken by a reporter and it's made public, that information is common knowledge now for those who can use it against the United States or use it to neutralize things that the United States may be doing.

**But isn't it a crime under the Espionage Act to have possession of information that you are not authorized to have?**

Yes. ...

**Reporters are worried that you might tell me, as an example, something that was classified and I might get prosecuted for knowing it.**

Well, I can't ever recall a reporter being prosecuted.

**So you don't think that will ever happen?**

No. I mean, it could, depend[ing] upon what the reporter did with the information. ... You could make a case that putting it in a paper is giving it to a country that would disadvantage the United States. But you get into the whole issues in the media, and I think that those are clear. And back to the seriousness of whether or not you're going to interview or whatever, keep in mind, we're not looking at the reporter as the subject. ...

home + introduction + watch online + interviews + parts 1 + 2 + part 3 + part 4 + join the discussion + producer chat
site map + press reaction + dvd/vhs & transcript + credits + privacy policy + journalistic guidelines

http://www.pbs.org/wgbh/pages/frontline/newswar/tags/espionage.html       :       10/16/2008

FRONTLINE series home + wgbh + pbs

posted feb. 13, 2007; last updated feb. 27, 2007

FRONTLINE is a registered trademark of wgbh educational foundation.
photo illustration copyright © entropy media
web site copyright 1995-2007 WGBH educational foundation

Feds May Prosecute Reporters Who Publish Leaks | News & Commentary | The Foundation for Econ...   Page 1 of 1

**Foundation for Economic Education**
30 South Broadway
Irvington-on-Hudson,
New York, 10533
1-B00-960-4FEE • 1-914-591-7230

Digg 

**submit**

# News & Commentary

## Feds May Prosecute Reporters Who Publish Leaks

*May 22, 2006*

"The government has the legal authority to prosecute journalists for publishing classified information, Attorney General Alberto Gonzales said Sunday. . . . He was referring to the 1917 Espionage Act, which made it a crime for an unauthorized person to receive national defense information and to transmit it to others." (*San Francisco Chronicle*, Monday)

"If I had to choose between government without newspapers, and newspapers without government, I wouldn't hesitate to choose the latter."

--Thomas Jefferson

**FEE Timely Classic**
**"The True Meaning of Patriotism"** by Lawrence W. Reed

©2007 Foundation for Economic Education. All Rights Reserved.
http://www.fee.org/in_brief/default.asp?id=494&year=2006&month=5

  

# LAW.COM

Select 'Print' in your browser menu to print this document.

Copyright 2008 ALM Properties, Inc. All rights reserved.

Page printed from: http://www.law.com

Back to Article

### DEA Employee Gets Prison Term for Leaking to Reporter

By R. Robin McDonald
01-15-2003

A federal judge in Atlanta has imposed a one-year prison sentence on a former intelligence analyst charged with stealing government information and leaking it to a London newspaper.

In a case that the U.S. Attorney in Atlanta says establishes a significant precedent, federal prosecutors assigned a media market price to the leaked information high enough to ensure a felony charge and increase the anticipated prison term.

William S. Duffey Jr., U.S. Attorney for the Northern District of Georgia, said the successful prosecution of former Atlanta Drug Enforcement Administration analyst Jonathan Randel stands as a warning to government employees, particularly law enforcement agents, who might consider providing sensitive, unclassified information to anyone, including journalists, outside of the federal government.

"It is our intention to prosecute those offenses," Duffey said. "We have to send that message to everybody within the justice system."

Duffey said Randel was prosecuted because the theft and sale of confidential government information "jeopardizes the integrity of the justice system. Here is a person who was hired in an intelligence-gathering function whom we entrusted with highly sensitive information. He had a duty and he agreed he had a duty to keep that information secret."





Duffey's prosecution of Randel is in line with a report by U.S. Attorney General John Ashcroft's interagency, anti-leak task force, which last year recommended that government administrators use laws already on the books to identify and punish employees who leak information.

The law under which Randel was prosecuted has been in existence for decades and applies to the theft of public money, property and records. It establishes a maximum 10-year prison sentence for the theft, embezzlement, or conversion of government property and also extends penalties to anyone who receives it.

Using that statute, Duffey's office defined information, including e-mail correspondence, as government property. Federal prosecutors in Atlanta placed a market value on the information Randel leaked, claiming it was worth at least $13,000, the amount Randel eventually received from the *Times* of London.

But prosecutors suggested the information may have had a far greater value. Last August, prosecutors called a London literary agent to testify in a hearing that the information the *Times* acquired and subsequently published had a market value of as much as 50,000 British pounds (about $80,000). The literary agent based his estimate on the news value of the *Times'* story in the competitive London newspaper market.

Neither Duffey nor a DEA spokesman in Washington, D.C., could cite any other cases where the government has prosecuted an employee for taking confidential but unclassified information and provided it to a news organization. A Justice Department spokesman in Washington could not be reached for comment.

### PROSECUTION CALLED VERY RARE

Kevin M. Goldberg, a partner at Washington, D.C.'s Cohn & Marks and legal counsel to the American Society of Newspaper Editors, suggests that Randel's prosecution is, if not unheard of, extremely rare. So broad is its potential application that, if applied across the board, the law might well have netted FBI staff attorney Coleen Rowley -- whose May 2002 memo to FBI Director Robert Mueller documented how agency higher-ups brushed off her field office's pleas to investigate a terrorist co-conspirator prior to Sept. 11, Goldberg said. *Time* this year included Rowley among three whistleblowers it named as "Persons of the Year."

In sentencing Randel last week, U.S. District Judge Richard W. Story of the Northern District of Georgia made it plain that he considered Randel's actions "a very serious crime."

While acknowledging, "No investigation was put at risk, lives were not lost," as a result of Randel's actions, Story said, "Anyone who would leak information poses a tremendous risk." The judge also compared Randel's actions to a "drunk driver who gets in a car and gets home without killing anybody. ... No agent got killed but the risk was certainly there."

Randel's lawyer, Atlanta attorney Steven H. Sadow, is appealing the sentence, seeking less time and house arrest or confinement to a halfway house.

### DATA BANKS TAPPED

In a plea agreement, Randel admitted that he supplied information from DEA data banks in 1999 to a British television correspondent who freelanced for the *Times*. Federal prosecutors say Randel sold the information for $13,000.

Sadow and *Times* solicitor Alastair Brett said the money the newspaper paid to Randel was to reimburse him for a trip to London to meet with *Times* officials after the newspaper was sued for libel. In addition to trip expenses, Sadow said the $13,000 covered the wages Randel lost by taking off work to make the trip.

The information Randel supplied -- which the *Times* published in a 1999 series of articles -- concerned Lord Michael Ashcroft, the former treasurer of Great Britain's Conservative Party, and his bank holdings in Belize. The controversy forced Ashcroft to resign as party treasurer, said his Atlanta attorney, Edward T.M. Garland, a partner at Garland, Samuel & Loeb. Ashcroft hired Garland to lobby federal prosecutors to bring a case against Randel.

Ashcroft is no relation to the U.S. attorney general, a government spokesman said.

According to court filings, Randel gave the reporter information from restricted DEA investigative databases in which Ashcroft's name had surfaced. The DEA files didn't implicate Ashcroft in any criminal activity, the *Times* reported. However, allegations in the *Times* articles that Ashcroft's name had surfaced in four separate investigations of drug-dealing and money-laundering were at the heart of a defamation suit he brought against the newspaper.

One DEA report stemmed from a request by a Belize attaché to research Ashcroft's activities in Belize because he was "acquiring significant assets" there. Ashcroft owns the Bank of Belize, according to redacted DEA reports included in court records. Belize's bank secrecy laws have helped drug dealers, among others, to

shield their financial activities from scrutiny by investigative agencies. Ashcroft's ownership of the bank caused his name to surface in DEA reports regarding investigations of at least one drug dealer who had laundered money through the Bank of Belize. Sadow said Randel willingly gave information to television correspondent Toby Follett because "he thought Ashcroft was getting a free ride for crooked activities. That's why he did what he did. Money had nothing to do with it."

## DEFAMATION CLAIMS SETTLED

*Times* owner Rupert Murdoch settled the defamation claims with Ashcroft in return for a front-page apology in which the *Times* stated that the paper had no evidence that Ashcroft had been involved in either drug-dealing or money-laundering, said *Times* solicitor Alastair Brett. Brett acknowledged that the *Times* did make payments to Randel, but that the money was to reimburse him for a trip he made to London in August 1999 to testify after Ashcroft sued. Garland said that Ashcroft "wanted his named cleared" and that his representatives met with the DEA and federal prosecutors and asked them to prosecute Randel for the leaks.

Garland said he sought to have the *Times* indicted as a co-conspirator because the statute under which Randel was prosecuted allows for the prosecution of anyone who solicits confidential information from a government employee.

"But the government wasn't interested in pursuing it that far," Garland said. Duffey wouldn't comment on whether he considered indicting the *Times*. The DEA subsequently released some of the information that Randel had given to the *Times* to other London newspapers under the federal Freedom of Information Act. Some of the information in DEA reports Randal released had been obtained from Dunn & Bradstreet, a company that sells business information. But Duffey said the government's decision to make the information public occurred after Randel released it to the *Times* and had no bearing on his prosecution.

"We look at the offense at the time it was committed," he said. "When this offense was committed, it was in violation of this employee's duties. What might have happened after that was irrelevant to the prosecution. At the time the information was disclosed by Mr. Randel, it was protected, sensitive information, and he had a duty not to disclose it."

## SWAP CALLED 'STANDARD'

Catherine S. Manegold, a James M. Cox Jr. professor of journalism at Emory University in Atlanta, said that Randel's prosecution ignores the fact that the unofficial flow of information between government employees and the reporters who cover them "is absolutely standard operating procedure for both sides."

Manegold said that although allegations that Randel sold the information make the situation ethically murky, the government's decision to prosecute him on a felony charge "sets up a dangerous precedent. ... It's not too different from McCarthyism. If an official says something, we all report it because we know it to be true. There is no counterbalance, no checks."

If people other than designated spokesmen are dissuaded from talking with the media because they fear prosecution, journalists "can't create a prism of information that gives us our one hope at a sense of real truth. If we are confined to official, pre-vetted statements, that's a terribly dangerous place to be."

DEA spokesman Will Glasby said that comparing the documents that Randel released to the *Times* to the information that law enforcement agents release to beat reporters "is like comparing apples and oranges."

"Absolutely, we provide information to the media," said Glasby. "But we're not selling classified information that is clearly in violation of federal law. Oranges is providing public information to a reporter just as I'm doing now. He provided written reports. ... You'd never get written reports out of me."

Court documents filed by federal prosecutors describe the information Randel provided to the *Times* as "sensitive and confidential" but not classified.

Rebecca Daugherty, the FOI Service Center director for the Reporters Committee for Freedom of the Press in Washington, D.C., called the decision to prosecute Randel "shocking."

"I think it's shocking the DEA took it that far," she said. "If it were classified information there would certainly be a reason to look at it. ... But sensitive and unclassified information is available to the public under the FOI act. I can't see how you can have a person jailed for giving that information out."

# washingtonpost.com

Hello hpf
Change Preferences | Sign Out

The Washington Post
Print Edition | Subscribe | PostPoints

Voices o
WATCH




SpringHill Suites.
A business hotel with an inspired sense of style.
EXPERIENCE SPRINGHILL SUITES ▶
Space, Light, Inspiration™

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS | CARS | RE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | | SHOPPING | |

SEARCH: [        ] go ⓦ washingtonpost.com ⓦ Web [          ] | Search Archives

washingtonpost.com > Politics > Special Reports > Plame Investigation

Print This Article
E-Mail This Article
Subscribe to The Post

THE PLAME INVESTIGATION
Key Players | Timeline | Wilson Report | Trial: Evidence / Synopsis

Advertisement

# White House Trains Efforts on Media Leaks
## Sources, Reporters Could Be Prosecuted

*By Dan Eggen*
*Washington Post Staff Writer*
*Sunday, March 5, 2006; Page A01*

The Bush administration, seeking to limit leaks of classified information, has launched initiatives targeting journalists and their possible government sources. The efforts include several FBI probes, a polygraph investigation inside the CIA and a warning from the Justice Department that reporters could be prosecuted under espionage laws.

In recent weeks, dozens of employees at the CIA, the National Security Agency and other intelligence agencies have been interviewed by agents from the FBI's Washington field office, who are investigating possible leaks that led to reports about secret CIA prisons and the NSA's warrantless domestic surveillance program, according to law enforcement and intelligence officials familiar with the two cases.

Numerous employees at the CIA, FBI, Justice Department and other agencies also have received letters from Justice prohibiting them from discussing even unclassified issues related to the NSA program, according to sources familiar with the notices. Some GOP lawmakers are also



Advertisement

FEATURED ADVERT

Lawyers: Mesothelio
Cool gadgets, hot de
Get your old 401(k) c
ID theft is happening
HP has unique produ
Earn 3.00% APY at I!
Tips from small busi
Watch Voices on Le
Do You Own Vangua
Today's Deal: Inspire

Ads by Google

Re-Elect Larry Deitcl
Ensure Long Term Inc

E-MAIL NEWSLETTERS

View a Sample and Sign Up
Daily Politics News &
Analysis
Federal Insider
Breaking News Alerts
Manage Your Newsletters

TODAY IN SLATE

The Derivatives
Market Is Worth
More Than the
World's Total
Wealth. Huh?

GRAPHIC
What the Jury Decided

GRAPHIC



On the Stand
A look at witnesses in the trial of I. Lewis "Scooter" Libby and their conversations about Valerie Plame and her husband, former ambassador Joseph C. Wilson IV.

considering whether to approve
tougher penalties for leaking.

In a little-noticed case in
California, FBI agents from Los
Angeles have already contacted
reporters at the Sacramento Bee
about stories published in July
that were based on sealed court
documents related to a terrorism
case in Lodi, according to the
newspaper.

Some media watchers, lawyers
and editors say that, taken
together, the incidents represent
perhaps the most extensive and
overt campaign against leaks in
a generation, and that they have
worsened the already-tense
relationship between
mainstream news organizations
and the White House.

"There's a tone of gleeful relish
in the way they talk about
dragging reporters before grand
juries, their appetite for
withholding information, and
the hints that reporters who look
too hard into the public's
business risk being branded
traitors," said New York Times
Executive Editor Bill Keller, in
a statement responding to
questions from The Washington
Post. "I don't know how far action will follow rhetoric, but some
days it sounds like the administration is declaring war at home on the
values it professes to be promoting abroad."

President Bush has called the NSA leak "a shameful act" that was
"helping the enemy," and said in December that he was hopeful the
Justice Department would conduct a full investigation into the
disclosure.

"We need to protect the right to free speech and the First
Amendment, and the president is doing that," said White House
spokesman Trent Duffy. "But, at the same time, we do need to
protect classified information which helps fight the war on terror."

---

www.LarryDeitchForRege

### MORE ON THE LIBBY TRIAL



The perjury trial of Vice
President Cheney's former
chief of staff calls up high-
profile witnesses.

Evidence Entered In
Trial  Government
exhibits used in the trial in
the format admitted in the
court.

Indictment: U.S. v Libby

The Verdict

Timeline

Photos: Libby Trial

Full Coverage

### WHO'S BLOGGING?

Read what bloggers are saying about this
article.

The Washington Monthly

The Texas Whip

The Strata-Sphere

Full List of Blogs (357 links) »

Most Blogged About Articles
On washingtonpost.com | On the web

POWERED BY
Technorati

### SAVE & SHARE ARTICLE    What's This?

Digg                    Google

del.icio.us             Yahoo!

Reddit                  Facebook

Advertisement

Disclosing classified information without authorization has long been against the law, yet such leaks are one of the realities of life in Washington -- accounting for much of the back-channel conversation that goes on daily among journalists, policy intellectuals, and current and former government officials.

Presidents have also long complained about leaks: Richard Nixon's infamous "plumbers" were originally set up to plug them, and he tried, but failed, to prevent publication of a classified history of the Vietnam War called the Pentagon Papers. Ronald Reagan exclaimed at one point that he was "up to my keister" in leaks.

Bush administration officials -- who complain that reports about detainee abuse, clandestine surveillance and other topics have endangered the nation during a time of war -- have arguably taken a more aggressive approach than other recent administrations, including a clear willingness to take on journalists more directly if necessary.

"Almost every administration has kind of come in saying they want an open administration, and then getting bad press and fuming about leaks," said David Greenberg, a Rutgers University journalism professor and author of "Nixon's Shadow." "But it's a pretty fair statement to say you haven't seen this kind of crackdown on leaks since the Nixon administration."

CONTINUED    **1**  **2**  **3**   **Next >**

| Print This Article | E-Mail This Article | Permission to Republish |

View all comments that have been posted about this article.

© 2007 The Washington Post Company

NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE         JOBS | CARS |

SEARCH:            ⓞ washingtonpost.com   ⓦ Web         Search Archiv

washingtonpost.com: About Us | Work for Us | Advertisers | Site Map | Search Terms | Topics Index | Make us your homepage | mywashington|
The Washington Post: Subscribe | Subscriber Services | Advertisers | PostPoints | Electronic Edition | Online Photo Store | The Washington Post
The Washington Post Company: Information and Other Post Co. Websites

© Copyright 1996-2008 The Washington Post Company | User Agreement and Privacy Policy | Rights and Permissions

» White House Seeks To Prosecute Reporters    http://www.rinf.com/columnists/news/white-house-seeks-to-prosecut

RINF.COM: THE BREAKING NEWS ALTERNATIVE       **RINF FORUMS: RELOADED**

Breaking News | tIX News | USA News | World News | Political News | Sci-Tech News | War & Terrorism News | Sports News | Multimedia | Set Homepage | Contact
This is just an archive. Visit the main page for the latest news.      BREAKING NEWS >

Ads by Google

Curtiss Reporting
Depositions & Video
Services Michigan's
Most Experienced
www.CurtissReporting.c

M.A.R Reporting
Group LLC
Court reporting,
litigation support &
videoconferencing –
Virginia/DC
www.mar-reporting.com

Depositions in
Alabama?
Our Court Reporters
Are Ready Certified,
Competent &
Courteous
www.ReaganReporters.

Minnesota Court
Reporters
35+ years of court
reporting exper.
Serving all MN cities
and counties.
www.benchmark-report

Sunday, March 5th, 2006

# White House Seeks To Prosecute Reporters

The Bush administration, seeking to limit leaks of classified information, has launched initiatives targeting reporters and their possible government sources. The efforts include several FBI probes, a polygraph investigation inside the CIA and a warning from the Justice Department that reporters could be prosecuted under espionage laws.

In recent weeks, dozens of employees at the CIA, the National Security Agency and other intelligence agencies have been interviewed by agents from the FBI's Washington field office, who are investigating possible leaks that led to reports about secret CIA prisons and the NSA's warrantless domestic surveillance program, according to law enforcement and intelligence officials familiar with the two cases.

Numerous employees at the CIA, FBI, Justice Department and other agencies also have received letters from Justice prohibiting them from discussing even unclassified issues related to the NSA program, according to sources familiar with the notices. Some GOP lawmakers are also considering whether to approve tougher penalties for leaking.

In a little-noticed case in California, FBI agents from Los Angeles have already contacted reporters at the Sacramento Bee about stories published in July that were based on sealed court documents related to a terrorism case in Lodi, according to the newspaper.

Some media watchers, lawyers and editors say that, taken together, the incidents represent perhaps the most extensive and overt campaign against leaks in a generation, and that they have worsened the already-tense relationship between mainstream news organizations and the White House.

"There's a tone of gleeful relish in the way they talk about dragging reporters before grand juries, their appetite for withholding information, and the hints that reporters who look too hard into the public's business risk being branded traitors," said New York Times Executive Editor Bill Keller, in a statement responding to questions from The Washington Post. "I don't know how far action will follow rhetoric, but some days it sounds like the administration is declaring war at home on the values it professes to be promoting abroad."

President Bush has called the NSA leak "a shameful act" that was "helping the enemy," and said in December that he was hopeful the Justice Department would conduct a full investigation into the disclosure.

"We need to protect the right to free speech and the First Amendment, and the president is doing that," said White House spokesman Trent Duffy. "But, at the same time, we also need to protect classified information which helps fight the war on terror."

Disclosing classified information without authorization has long been against the law, yet such leaks are one of the realities of life in Washington — accounting for much of the back-channel conversation that goes on daily among journalists, policy intellectuals, and current and former government officials.

Presidents have also long complained about leaks: Richard Nixon's infamous "plumbers" were originally set up to plug them, and he tried, but failed, to prevent publication of a classified history of the Vietnam War called the Pentagon Papers. Ronald Reagan exclaimed at one point that he was "up to my keister" in leaks.

Bush administration officials — who complain that reports about detainee abuse, clandestine surveillance and other topics have endangered the nation during a time of war — have arguably taken a more aggressive approach than other recent administrations, including a clear willingness to take on journalists more directly if necessary.

"Almost every administration has kind of come in saying they want an open administration, and then getting bad press and fuming about leaks," said David Greenberg, a Rutgers University journalism professor and author of "Nixon's Shadow." "But it's a pretty fair statement to say you haven't seen this kind of crackdown on leaks since the Nixon administration."

But David B. Rivkin Jr., a partner at Baker & Hostetler in Washington and a senior lawyer in the Reagan and George H.W. Bush administrations, said the leaking is "out of control," especially given the unique threat posed by terrorist groups.

"We're at the end of this paradigm where we had this sort of gentleman's agreement where you had leaks and journalists were allowed to protect the leakers," Rivkin said. "Everyone is playing Russian roulette now."

At Langley, the CIA's security office has been conducting numerous interviews and polygraph examinations of employees in an effort to discover whether any of them have had unauthorized contact with journalists. CIA Director Porter J. Goss has spoken about the issue at an "all hands" meeting of employees, and sent a recent cable to the field aimed at discouraging media contacts and reminding employees of the penalties for disclosing classified information, according to intelligence sources and people in touch with agency officials.

"It is my aim, and it is my hope, that we will witness a grand jury investigation with reporters present being asked to reveal who is leaking this information," Goss told a Senate committee.

The Justice Department also argued in a court filing last month that reporters can be prosecuted under the 1917 Espionage Act for receiving and publishing classified information. The brief was filed in support of a case against two pro-Israel lobbyists, who are the first nongovernment officials to be prosecuted for receiving and distributing classified information.

Sen. Pat Roberts (R-Kan.), chairman of the Senate intelligence committee, said last month that he is considering legislation that would criminalize the leaking of a major class of classified information than what is now covered by law. The measure would be similar to earlier legislation that was vetoed by President Bill Clinton in 2000 and opposed by then-Attorney General John D. Ashcroft in 2002.

But the vice chairman of the same committee, Sen. John D. Rockefeller IV (D-W.Va.), complained in a letter to the national intelligence director last month that "damaging revelations of intelligence sources and methods are

Dallas Court Reporters
Dallas Court Reporters guides. Find Dallas Court Reporters now.
jayde.com

Hugh Downs Reports
Little known heart attack symptom many people tragically ignore.
www.bottomlinesecrets.com

Court Reporters
Court Reporters guide. Shop for Court Reporters now!
resellerratings.com

Related News:
» Bush Seeks GOP Support for Terror Bills
» Man held for tossing harmless package at White House
» White House acts to stem media leaks
» Bush White House to be subpoenaed by wiretap lawyers
» Latest Bush administration leak comes from ..Bush

Other Top Stories
» Blair's God comments anger families of Iraq casualties
» Thousands of federal cases kept secret
Ads by Google

Lamonta Court Reporting
Get a court reporter right now. We're just a phone call away!
lamonta-il.com

Water Heater Leaks
Guide, Resources & Information Water Heater Leaks
Rareassanges.com

Miami Court Reporters
Excellent deals on all products in stock now.
www.valioexte.com

Dallas Court Reporters
Dallas Court Reporters guides. Find Dallas Court Reporters now.
jayde.com

generated primarily by Executive Branch officials pushing a particular policy, and not by the rank-and-file employees of the intelligence agencies."

As evidence, Rockefeller points to the case of Valerie Plame, a CIA officer whose identity was leaked to the media. A grand jury investigation by Special Counsel Patrick J. Fitzgerald resulted last year in the jailing of Judith Miller, then a reporter at the New York Times, for refusing to testify, and in criminal charges against I. Lewis "Scooter" Libby, who resigned as Vice President Cheney's chief of staff. In court papers, Libby has said that his "superiors" authorized him to disclose a classified government report.

The New York Times, which first disclosed the NSA program in December, and The Post, which reported on secret CIA prisons in November, said investigators have not contacted reporters or editors about those articles.

Leonard Downie Jr., executive editor of The Post, said there has long been a "natural and healthy tension between government and the media" on national security issues, but that he is "concerned" about comments by Goss and others that appear to reflect a more aggressive stance by the government. Downie noted that The Post had at times honored government requests not to report particularly sensitive information, such as the location of CIA prisons in Eastern Europe.

"We do not want to inadvertently threaten human life or legitimately harm national security in our reporting," he said. "But it's important . . . in our constitutional system that these final decisions be made by newspaper editors and not the government."

In Sacramento, the Bee newspaper reported last month that FBI agents had contacted two of its reporters and, along with a federal prosecutor, had "questioned" a third reporter about articles last July detailing the contents of sealed court documents about five terrorism suspects. A Bee article on the contacts did not address whether the reporters supplied the agents with any information or whether they were subject to subpoenas.

Executive Editor Rick Rodriguez said last week he could not comment based on the advice of newspaper attorneys. Representatives of the FBI and the U.S. attorney's office in Los Angeles, which is conducting the inquiry, also declined to comment.

CIA spokeswoman Jennifer Millerwise Dyck declined to discuss details of the leak investigations there but said they were being conducted independently of the White House and were not aimed at pressuring journalists.

In prosecuting a former Defense Department analyst and two pro-Israel lobbyists for allegedly spreading sensitive national security information about U.S. policy in the Middle East, the Bush administration is making use of a statute whose origins lie in the first anxious days of World War I.

The Espionage Act makes it a crime for a government official with access to "national defense information" to communicate it intentionally to any unauthorized person. A 1950 amendment aimed at Soviet spying broadened the law, forbidding an unauthorized recipient of the information to pass it on, or even to keep it to himself.

Lawyers for American Israel Public Affairs Committee staff members Steven J. Rosen and Keith Weissman say the vagueness of the statute makes the Justice Department's prosecution of their clients unconstitutional. One count of the indictment specifically charges them with passing "classified national defense information" to a member of the media in 2004.

The Justice Department said "there plainly is no exemption" for the media under the Espionage Act, but added, "a prosecution under the espionage laws of an actual member of the press for publishing classified information leaked to it by a government source would raise legitimate and serious issues and would not be undertaken lightly, indeed, the fact that there has never been such a prosecution speaks for itself."

Staff writer Charles Lane and researcher Julie Tate contributed to this report.

Â© 2006 The Washington Post Company

**Discuss White House Seeks To Prosecute Reporters in the forum!**

**Related News:**
» Bush Seeks GOP Support for Terror Bills
» Man held for tossing harmless package at White House
» White House acts to stem media leaks
» Bush White House to be subpoenaed by wiretap lawyers
» Latest Bush administration leak comes from ...Bush

**Other Top Stories:**
» Blair's God comments anger families of Iraq casualties
» Thousands of federal cases kept secret
Ads by Google

This entry was posted on Sunday, March 5th, 2006 at 7:52 am and is filed under Media & Propaganda . You can follow any responses to this entry through the RSS 2.0 feed. You can leave a response, or trackback from your own site.

Activism & Protest News | Business News | Civil & Human Rights News | Environmental News | Media News | Globalisation News | Web Development News

Cheap DVDs and Conspiracy DVDs Debt Consolidation & Loans
The views expressed in the RINF news wire and newsletter are the sole responsibility of the author (s) and do not necessarily reflect the views of the webmaster.
RINF.COM: Breaking News & Alternative Media is Copyleft - Copy & Distribute Freely.